IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MISSOURI
2                     WESTERN DIVISION

3
      ROSEMARY A. SALERNO,          )
4                                   )
                 Plaintiff,         )   No. 19-00145-CV-W-BP
5                                   )   October 5, 2020
           V.                       )   Kansas City, Missouri
6                                   )   CIVIL
      MPI MANAGEMENT, LLC, *doing*  )
7     *business as* Olshan          )   VOLUME I
      Properties,                   )   (Pages 1-144)
8                                   )
                 Defendant.         )
9

10

11              TRANSCRIPT OF JURY TRIAL

12

13         BEFORE THE HONORABLE BETH PHILLIPS
              UNITED STATES DISTRICT JUDGE
14

15

          Proceedings recorded by electronic stenography
16              Transcript produced by computer

17

18

19

20

21

22

23

24

25

                     Kathleen M. Wirt, RDR, CRR
                     United States Court Reporter
          400 E. 9th Street, Suite 7452 * Kansas City, MO 64106

```
 1                      APPEARANCES

 2
         For Plaintiff:          MS. ATHENA M. DICKSON
 3                               MR. RYAN PATRICK McENANEY
                                 MR. RIK N. SIRO
 4                               MR. RAYMOND A. DAKE
                                 Siro Smith Dickson, PC
 5                               1621 Baltimore Avenue
                                 Kansas City, MO 64108
 6
         For Defendant:          MR. SAMUEL N. LILLARD
 7                               Fisher Phillips, LLP
                                 250 West Street, Suite 400
 8                               Columbus, OH 43215

 9                               MS. ARIEL M. KELLY
                                 Fisher Phillips, LLP
10                               3310 West End Avenue, Suite 500
                                 Nashville, TN 37203
11
                                 MS. SPRING E. TAYLOR
12                               Fisher Phillips, LLP
                                 4900 Main Street, Suite 650
13                               Kansas City, MO 64112

14

15

16

17

18

19

20

21

22

23

24

25
```

1

                              I N D E X

                             VOLUME I
                          (Pages 1-144)

OCTOBER 5, 2020

Pretrial conference                                         9

Plaintiff's opening statement                              17
Defense opening statement                                  31


PLAINTIFF'S WITNESSES:

   ROSEMARY SALERNO
        Direct Examination by Ms. Dickson                  41
        Resumed Direct Examination by Ms. Dickson          65

                             - - -

                             VOLUME II
                          (Pages 145-426)

OCTOBER 6, 2020

PLAINTIFF'S WITNESSES (continued):

   ROSEMARY SALERNO
        Resumed Direct Examination by Ms. Dickson         165
        Resumed Direct Examination by Ms. Dickson         231
        Cross-examination by Mr. Lillard                  241
        Resumed Cross-examination by Mr. Lillard          299
        Redirect Examination by Ms. Dickson               321
        Jury Questions asked by the Court                 335
        Further Direct Examination by Ms. Dickson         340

   PAULA LAND
        Direct Examination by Mr. Siro                    342
        Resumed direct examination by Mr. Siro            368
        Cross-examination by Ms. Taylor                   372
        Redirect Examination by Mr. Siro                  386
        Jury Questions asked by the Court                 395

   JANETTA TISCHER
        Direct Examination by Mr. Siro                    399

                             - - -

1                        VOLUME III
                     (Pages 427-670)
2
     OCTOBER 7, 2020
3
     PLAINTIFF'S WITNESSES (continued):
4
         WAYNE CHANG
5            Direct Examination by Ms. Dickson          439
             Resumed Direct Examination by Ms. Dickson  467
6            Cross-examination by Mr. Lillard           471
             Redirect Examination by Ms Dickson         501
7            Jury Questions asked by the Court          507

8        JANETTA TISCHER
             Resumed Direct Examination by Mr. Siro     514
9            Resumed Direct Examination by Mr. Siro     622
             Cross-examination by Mr. Lillard           644
10
         ANDREA OLSHAN
11           Direct Examination by Ms. Dickson          547
             Resumed Direct Examination by Ms. Dickson  590
12           Cross-examination by Mr. Lillard           591
             Redirect Examination by Ms Dickson         613
13           Jury Questions asked by the Court          617

14                         - - -

15                       VOLUME IV
                     (Pages 671-959)
16
     OCTOBER 8, 2020
17
     PLAINTIFF'S WITNESSES (continued):
18
         JANETTA TISCHER
19           Resumed Cross-examination by Mr. Lillard   688
             Redirect Examination by Mr. Siro           713
20           Recross-examination by Mr. Lillard         730
             Jury Questions asked by the Court          739
21
         STEPHEN BARNHOUSE
22           Direct Examination by Ms. Dickson          742
             Resumed Direct Examination by Ms. Dickson  753
23           Cross-examination by Mr. Lillard           793
             Resumed Cross-examination by Mr. Lillard   805
24           Redirect Examination by Ms Dickson         821
             Recross-examination by Mr. Lillard         824
25           Jury Questions asked by the Court          831

TODD SHARBONO
    Direct Examination by Mr. McEnaney                836
    Cross-examination by Ms. Kelly                    879
    Jury Questions asked by the Court                 906
    Further Cross-examination by Ms. Kelly           908

DEFENSE WITNESSES:

    DAVID McLAUGHLIN
    Direct Examination by Mr. Lillard                 911
    Cross-examination by Mr. McEnaney                 923
    Jury Questions asked by the Court                 926
    Further Direct Examination by Mr. Lillard        929

- - -

VOLUME V
(Pages 960-1035)

OCTOBER 9, 2020

Instructions conference                              968

Plaintiff's closing argument                         990
Defense closing argument                             1004
Plaintiff's rebuttal argument                        1018

Verdicts read                                        1031
                            - - -


                    E X H I B I T S

| PLAINTIFF'S EXHIBITS | OFFERED | RECEIVED |
| --- | --- | --- |
| 1 - Olshan Properties handbook | 126 | 126 |
| 4 - plaintiff's employment history | 44 | 44 |
| 6 - annual review | 60 | 60 |
| 7 - annual review | 66 | 66 |
| 8 - performance evaluation | 62 | 62 |
| 9 - annual review | 163 | 163 |
| 10 - team member counseling | 120 | 120 |
| 11 - memo | 122 | 122 |

| | | | |
|---|---|---|---|
| 1 | 12 - e-mail | 318 | 318 |
| 2 | 13 - e-mail | 522 | 522 |
| 3 | 14 - report of investigation | 533 | 533 |
| 4 | 16 - time off chart | 640 | 640 |
| 5 | 18 - memo | 774 | 774 |
| 6 | 20 - e-mail | 442 | 442 |
| 7 | 23 - blank calendar | -- | -- |
| 8 | 24 - voice mail | 520 | 520 |
| 9 | 26 - e-mail | 633 | 633 |
| 10 | 27 - e-mail | 637 | 637 |
| 11 | 29 - press release | 163 | 163 |
| 12 | 30 - transfer request | 453 | 453 |
| 13 | 31 - e-mail | 454 | 454 |
| 14 | 32 - e-mail | 469 | 469 |
| 15 | 33 - audit spreadsheet | 163/461 | 463/461 |
| 16 | 34 - e-mail | 781 | 781 |
| 17 | 36 - e-mail | 463 | 463 |
| 18 | 37 - e-mail | 467 | 468 |
| 19 | 40 - e-mail | 325 | 418 |
| 20 | 42 - wire transfers | 666 | 666 |
| 21 | 43 - bank statements | 163 | 163 |
| 22 | 50 - employer application for review | 163 | 163 |
| 23 | 51 - court petition against plaintiff | 217 | 217 |
| 24 | 65 - article (redacted) | 91 | 154 |
| 25 | 72 - photo of bench | 136 | 136 |

| | | |
|---|---|---|
| 1 | 75 - photo of booth | 163 | 163 |
| 2 | 76 - photos | 861 | 861 |
| 3 | 87 - GM job description | 52 | 52 |
| 4 | 88 - GM job description | 689 | 689 |
| 5 | 109 - realty group job offer | 223 | 223 |
| 6 | 110 - 2017/2018 W-2s | 233 | 234 |
| 7 | 111 - 2019 W-2 | 234 | 234 |
| 8 | 112 - last paycheck | 234 | 234 |
| 9 | 114 - plaintiff's charge (redacted) | 437 | 438 |
| 10 | 128 - Tischer affidavit | 628 | 628 |
| 11 | 130 - Tischer affidavit | 631 | 631 |
| 12 | 146 - 2018 financial info | 877 | 878 |
| 13 | 146A - statute 407.020 | Judicial Notice |
| 14 | 147 - 2019 financial info | 877 | 878 |
| 15 | 147A - MAI conversion verdict director | Judicial Notice |
| 16 | 148 - common law fraud | Judicial Notice |
| 17 | 149 - unjust enrichment | Judicial Notice |

| | DEFENDANT'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|---|
| 19 | 1 - Olshan Properties handbook | 254 | 254 |
| 20 | 2 - Salerno acknowledgment | 320 | 321 |
| 21 | 3 - team member counseling | 252 | 252 |
| 22 | 4 - report of investigation | 321 | 321 |
| 23 | 5 - termination of employment | 691 | 691 |
| 24 | 6 - memo | 695 | 695 |
| 25 | 7 - memo | 254 | 254 |

```
12 - Land voice mail                    752        752

18 - RT Rustics Facebook photos         268        269

19 - plaintiff's LinkedIn page          244        245

20 - Strobel affidavit                  309        --

22 - Lowe's invoice                     705        706

24 - Home Depot receipt                 705        705

25 - e-mail with evaluation             247        247

27 - photo                              283        283

28 - Facebook screenshot                258        258

30 - photos

34 - Facebook entry                     261        261

35 - time off chart                     291        291

52 - cooperative agreement              305        305

55 - Facebook video                     278        278

56 - Facebook video                     985        985

57 - text messages (withdrawn)          280        withdrawn

62 - facilities manager job
     description                         880        880

78 - initial unemployment notice        315        315

                        *  *  *  *  *
                         *  *  *  *
```

OCTOBER 5, 2020

- - -

(The following proceedings were had in the courtroom out of the presence of the jury panel:)

THE COURT:  Good morning.  We have 22 jurors ready to participate in jury selection.  We had, I think, four jurors that unfortunately either had exposure to COVID or were released based upon their responses to the questions that were asked.  I don't know exactly what the reasoning was.  But due to COVID reasons, four of them arrived but were told they did not need to serve.  So with a jury of eight and three peremptory strikes on each side, I think a jury of 22 will be sufficient.  As I mentioned -- or a panel of 22 will be sufficient.

As I mentioned, depending upon how the strikes go, strikes for cause go, I will reduce the number of jurors as need be.  I would prefer to not go below six -- I mean seven, but we'll just have to play that as we go along.

I do want to start promptly at 9 a.m. so that we can make sure and get the jury selected around the noon hour.  So let me take up a few of the issues that we -- well, some of the legal issues.  But before I do that, let me open up the floor. Are there any questions or issues that the parties have with respect to jury selection that need to be taken up before we move down to the jury room?  Ms. Dickson?

1        MS. DICKSON:  Yes.  Plaintiff has just one

2 preliminary matter that I do think affects jury selection, so

3 we would like to do it before then.

4        At this time, plaintiff would like to dismiss Zona

5 Rosa Town Center from this action, given that MPI Management,

6 LLC, has indicated they were plaintiff's employer, that they

7 had 600 employees at the time of termination, and that --

8 assertions that Zona Rosa Town Center didn't have any

9 employees.

10        THE COURT:  Is there any objection to dismissing

11 Zona Rosa, LLC?

12        MR. LILLARD:  On behalf of the defendant, Zona Rosa

13 Town Center, there's no objection to dismissing that defendant.

14        THE COURT:  Okay.  That defendant will be dismissed.

15        Ms. Dickson, do you have any other issues that you'd

16 like to take up that affect jury selection?

17        MS. DICKSON:  No, Your Honor.

18        THE COURT:  Mr. Lillard?

19        MR. LILLARD:  Your Honor, just for clarification,

20 the Court has indicated that there are 26?

21        THE COURT:  Twenty-two.

22        MR. LILLARD:  Twenty-two?

23        THE COURT:  We had hoped to have 26, but...

24        MR. LILLARD:  And is the -- are there jury

25 questionnaires -- I mean, jury forms that would have some

1  identifying information available for the parties?

2         THE COURT:  Yes.  Those are being created right now.

3  By the time we get down to the jury room, you'll have those.

4         MR. LILLARD:  Okay.

5         THE COURT:  They don't have a ton of information,

6  but they show employment, marital status, what county they live

7  in.

8         MR. LILLARD:  We'll do the discussion in another

9  room, I think the Court indicated the last time?

10        THE COURT:  The questioning of the jurors?

11        MR. LILLARD:  Yes, Your Honor.

12        THE COURT:  Yes, down on the second floor in the

13 jury room.

14        MR. LILLARD:  No further questions.  Thank you, Your

15 Honor.

16        THE COURT:  Then let's take up a couple of issues.

17 One would be the whistleblower claim and the argument that

18 defendant has made that there's no alleged violation of any

19 law.

20        Ms. Dickson, what is your response to that argument

21 and to the most recent filing by defendant on this issue?

22        MS. DICKSON:  We dispute that there isn't any kind

23 of violation of law.  We have indicated in our amended petition

24 multiple violations of law that would have been committed, had

25 Ms. Salerno performed these -- what she was being asked to do,

1  including fraud, conversion, unjust enrichment, and as well,

2  we've listed a statute -- I can get you the number of the

3  statute -- that indicates the charitable funds, and those were

4  argued in our summary judgment, as well.

5          THE COURT:  Can you point me to the paragraphs in

6  the amended complaint?

7          MS. DICKSON:  Yes, I can.

8          THE COURT:  I guess it would be paragraph 89?

9          MS. DICKSON:  I'm sorry.  You're getting there

10  faster than I am.  I apologize.

11          Yes, Your Honor, paragraph 89, as well as the

12  briefing in the summary judgment, which went further to discuss

13  the violations of the law and public policy.

14          THE COURT:  Mr. Lillard, why do you believe that the

15  allegation of violation of law such as conversion, fraud, and

16  unjust enrichment and the statute, 407, are not sufficient?

17          MR. LILLARD:  Well, first of all, Your Honor, the

18  claims asserted in this case don't match those elements of any

19  of those claims, plus they're -- under the whistleblower

20  statute, has to have alleged a violation of the regulation, of

21  actual statute.  And although Missouri has statutes, those

22  relate to merchandising, not a situation such as that.  In

23  fact, there's just simply no case law in Missouri that applies

24  to it and to base a whistleblower statute claim on.

25          Again, Your Honor, the key thing, I think, for

1  Missouri statute is that the plaintiff's subjective belief of a
2  law violation is simply not enough.  It actually has to be, has
3  to -- she has to believe that it violates Missouri law, and
4  then it actually has to violate Missouri law.  There is no
5  violation of Missouri law that has occurred in this case or has
6  been alleged in this case or is plausible in this case related
7  to the parking-meter funds.

8         THE COURT:  Well, I do think it's a violation of the
9  law.  There's nothing that says it has to be an actual statute.
10  The plain language of the statute says exactly that, just a
11  violation of the law.

12         So at this point, I don't believe that it is
13  appropriate to dismiss the whistleblower count, and we can move
14  forward and hear what the evidence is and decide whether or not
15  the claim goes to the jury at the appropriate time.

16         The next issue that I'd like to take up, and then
17  we'll move down to the jury room, is the testimony regarding
18  defendant's attorney, quote, unquote, liking the plaintiff's
19  Facebook page.  I have looked into this issue and have
20  concluded that it is not appropriate to admit that evidence for
21  a couple of different reasons.

22         No. 1, I just still don't really see how it's
23  retaliation.  Second of all, I think that it would result in a
24  mini trial on how it happened and would be very logistically
25  difficult, given the fact that Mr. Lillard would then have to

1  in some respect testify or give a version of the events.  So I

2  am going to grant defendant's motion in limine on that

3  testimony.

4            Everything else I think we need to take up later

5  because I do want to begin promptly at 9:00.  I would ask,

6  then, that the parties go down to the second floor jury room.

7  There are two tables there that you may have seen that we can

8  then -- that -- or two sides that each of you can sit at.

9  We'll pick a jury; and then to the extent there are any legal

10 issues that need to be taken up prior to opening statements, we

11 can take those up during the lunch hour, essentially.

12            So with that, we will be in recess and we will

13 resume down in the jury room.

14            (A recess was taken at 8:48 a.m., after which jury

15 selection was conducted.  Thereafter, the following proceedings

16 were had in the courtroom beginning at 1:16 p.m. out of the

17 presence of the jury:)

18            THE COURT:  Are we ready to bring the jury out?

19            COURTROOM DEPUTY:  Yes, Judge, they're all here.

20            THE COURT:  LaTandra is going to seat them in the

21 back of the room.

22            COURTROOM DEPUTY:  I'll place them all on one side

23 since the monitor is there.

24            THE COURT:  Okay.  Then we'll seat them and see how

25 that works out.

1      MR. LILLARD:  Your Honor, just a point of

2 clarification, do we need a walking mic?

3      THE COURT:  If you're going to be someplace other

4 than the podium or the microphone there at your table, yes.

5      MR. LILLARD:  Then we would probably need one

6 available, then.  Do we share the same one?

7      THE COURT:  There should be another one.  LaTandra,

8 though, has it.  When LaTandra comes back in, as I'm reading

9 the instructions -- we'll swear the jury in, I'll read the

10 instructions, and then we'll do opening.  So when I'm reading

11 the instructions, ask LaTandra.  I don't know where it is.

12      And I forgot to mention, the viewing room is not the

13 jury assembly room, it's on the fourth floor.  It's a training

14 room on the fourth floor.  There should be a CSO on the fourth

15 floor, and the person can ask the CSO where it is.  It's on

16 this side of the building.

17      Well, this shouldn't take quite this long.  I'm not

18 real sure what the issue is.

19      (The following proceedings were had in the courtroom

20 in the presence of the jury:)

21      THE COURT:  So a few housekeeping matters.

22      First of all, before we picked the jury, everyone

23 stood when I came into the room in deference to the role that I

24 play in the trial.  Now we stand in deference to the role that

25 you play in the trial.  So when you come into the courtroom,

1  please feel free to be seated.  Once all the jurors are in the
2  courtroom, then the rest of us will be seated.

3          Second of all, as I told you, we've had a number of
4  trials already.  We have not yet perfected the process, I will
5  be the first to say, and we've seated jurors in different
6  locations during every trial.  What is important and what we'll
7  want to know is if you cannot see the evidence, which will be
8  on the monitor right there, if you can't see the witness, who
9  will be seated up here to my right, and if you can't hear.  So
10 if at some point during the proceeding one of those three or
11 all of them fail, let us know.  If you can see a tweak that
12 would make you feel more comfortable, such as sitting over
13 there -- we've put jurors in the jury box, which is where the
14 jury normally sits -- talk with LaTandra, and we're willing to
15 tweak this process as we move on.  So continue to have
16 conversations with LaTandra if there's something that we can
17 do.

18         So here is what we're going to do this afternoon.
19 First I'm going to swear you in and then -- or LaTandra is
20 going to swear you in, and then I'm going to read a set of
21 instructions that are some preliminary instructions, and then
22 we will move into opening statements that both parties will
23 provide.  And we will actually hear some testimony this
24 afternoon.  So we plan to get a lot done this afternoon to
25 ensure the case keeps moving forward at the pace that we

1  anticipate.

2          So the first thing I'm going to do is ask that each

3  of you stand, and LaTandra is going to give you a slightly

4  different oath than the one you took this morning.

5          (The jury was sworn by the courtroom deputy.)

6          THE COURT:  Thank you, you may be seated.

7          (The opening instructions were read by the Court.)

8          THE COURT:  That is all the instructions that we

9  have at this time, and we are ready for opening statement.

10 Ms. Dickson, are you ready to proceed?

11         MS. DICKSON:  Yes, Your Honor.  Can I rotate this?

12         THE COURT:  Do you know how to rotate it?

13         MS. DICKSON:  I do know how to, I'm just asking for

14 permission.

15         THE COURT:  Yes.  I just want to make sure that

16 whoever does it knows how to.  I think it kind of moves itself.

17         MS. DICKSON:  May it please the Court.

18         THE COURT:  You may proceed.

19         MS. DICKSON:  Counsel.

20         Figure out a way.  We are here today because Ms.

21 Salerno refused to figure out a way to use charitable funds to

22 cover her employer's financial difficulties.

23         Ms. Salerno was a solid employee for 14 years,

24 received a favorable review and raise just weeks before her

25 termination.  She only had one discipline in 14 years, and

1  within six days of refusing to move charitable funds to cover

2  operating expenses, she receives a surprise visit from her

3  supervisor and head of human resources and is fired hours

4  later.  This is an egregious case of discrimination and

5  retaliation, and we are here to hold defendants accountable for

6  the misconduct.

7           Good afternoon, ladies and gentlemen of the jury.

8  My name is Athena Dickson, and I, along with Ryan McEnaney and

9  Rik Siro, represent the plaintiff, Rosemary Salerno.  The

10 purpose of opening statements is to give you a background and

11 an overview of what we expect to prove during this trial today.

12          So let's talk about Zona Rosa.  Zona Rosa is a

13 mixed-use shopping center in the Northland of Kansas City, and

14 by mixed use, we mean that it has everything from retail,

15 residential, restaurants, office space.  And it's right off of

16 Barry Road in the Northland.  Plaintiff became the general

17 manager in 2004 before Zona Rosa even opened.  As general

18 manager, plaintiff was in charge of managing the property,

19 staff, and tenants.

20          Now, initially when plaintiff started her employment

21 with Zona Rosa, the property was owned by Olshan and managed by

22 another company, Steiner & Associates, until 2010.  Olshan took

23 over management in 2010, and plaintiff was grandfathered in as

24 an employee for Olshan Properties.

25          Plaintiff had a small staff, and it included names

1   you'll hear throughout this case:  Todd Sharbono, Paula Land,

2   David Spud McLaughlin, Brenda Noorbakhsh, and Madelyn Bowden,

3   just to name a few.

4           So if a patron went to Zona Rosa during Ms.

5   Salerno's tenure, they can either park in the parking garages

6   around the facility, or they had short-term parking that were

7   parking-meter spaces.  These parking meters and the proceeds

8   were kept in a separate account and given to the community

9   during Ms. Salerno's tenure.  This program was called Change

10  for Charity.  Similarly, tickets issued for violations, if you

11  went to and parked at -- the patrons who went to and parked at

12  these parking meters, they would receive tickets that if you

13  paid the tickets, that money additionally went to the Change

14  for Charity program.  During plaintiff's employment, the money

15  from the Change for Charity program went to the community

16  through scholarships, charitable events, and money directly to

17  charities.

18          When Ms. Salerno started at Zona Rosa as the general

19  manager, she was told that community was important and to look

20  at charities, get involved with charities, get involved with

21  boards, and be the face of Zona Rosa.  During plaintiff's

22  tenure, the Change for Charity program gave over $2 million to

23  local community organizations.  Plaintiff worked on developing

24  great relationships, marketing Zona Rosa, and to build and

25  maintain relationships with tenants, employees, and the public.

1    You will hear that plaintiff also worked hard on
2  marketing and had innovative ideas to help get people into Zona
3  Rosa.  You will hear about some signature events they had
4  there, as well as bands, an Easter parade, the Taste of Zona
5  Rosa, and events that she put together, like Orange Wednesday
6  is the New Black Friday event.  Plaintiff, Zona Rosa, and her
7  staff and Olshan Properties was recognized for these efforts
8  multiple times during plaintiff's tenure by the trade
9  association of the International Council of Shopping Centers.
10  It's referred to as the ICSC.

11    We expect the evidence to show that during
12  plaintiff's tenure, she reported to several supervisors.  She
13  understood that each supervisor had a slightly different way of
14  handling matters.  Plaintiff's last supervisor during her
15  tenure was a Mr. Stephen Barnhouse, who was a fairly new
16  employee of Olshan.  Ms. Salerno knew Mr. Barnhouse somewhat
17  because he was from Kansas City.  One of plaintiff's jobs as
18  general manager was to secure business sponsorship and to
19  secure vendors to come to Zona Rosa and hold events.  Plaintiff
20  worked diligently on her end to secure any ancillary income she
21  could for Zona Rosa.

22    In 2017, Zona Rosa won what is called a MAXI Award.
23  This is an award that is issued by the ICSC.  This event took
24  place in Las Vegas, and plaintiff attended this event, and she
25  invited the staff to attend with her if they would like.  This

1  had been the case on more than just 2017. There had been

2  multiple years that if anyone wanted to attend that had worked

3  on the programs that were being sponsored, that they could go,

4  as long as everyone interested paid their own way. They had to

5  pay their expenses to go to this award show.

6         So what is the MAXI Awards? The MAXI Awards was

7  kind of like the Academy Awards. You had a list of finalists,

8  but you didn't know who won unless you attended the event. So

9  Ms. Salerno attended the MAXI events in 2017, and this was a

10 very special occasion because not only did Zona Rosa win a MAXI

11 Gold, which is the highest honor that the MAXIs have, they also

12 received a Judges' Distinction, an award never given before at

13 these events, for Zona Rosa's marketing efforts on The 12 Days

14 of Facebook Live. And part of the reason that they received

15 this special judges' recognition on it is because this program

16 was so successful and was done on such a small budget.

17 Plaintiff will tell you that this was a wonderful recognition

18 for her, Zona Rosa, and Olshan Properties, and was a high note

19 of her career to be recognized for the hard work.

20        She came back from this event, and the first day

21 that she's back to the office after winning this prestigious

22 award, plaintiff receives the first discipline in her entire

23 tenure with the company. Plaintiff was counseled by her direct

24 supervisor, Stephen Barnhouse, for a coverage issue at the

25 center and is given a first infraction. Plaintiff follows up

1    from -- plaintiff follows up with the discipline for

2    clarification and received no response.  You will hear in 14

3    years managing Zona Rosa, this is the only instance of

4    discipline involving plaintiff before her termination.

5            You will also hear that plaintiff is very involved

6    in the community.  She serves on many boards and is active.

7    One of the organizations she works at is -- she works with is

8    the Hillcrest Transitional Housing.  We expect the evidence to

9    be that in the summer of 2016, Ms. Salerno worked on a

10   furniture project for Zona Rosa to donate to the Hillcrest

11   gala.  You will hear that she worked on this project with the

12   manager of facilities, Todd Sharbono.  You'll hear that Ms.

13   Salerno liked doing these kind of creative things, that she

14   liked restoring, she liked repurposing old furniture, and she

15   and Mr. Sharbono began to make other furniture as a hobby on

16   the side outside of work.

17           In the spring of 2017, plaintiff also worked with an

18   outside vendor, Vintage Market, to hold an event at Zona Rosa.

19   It was a three-day promotional event where vendors came in and

20   sold vintage goods.  This generated income for Zona Rosa, and

21   additionally, many vendors leased space at the Vintage Market

22   Days to sell their wares.

23           The event was done in the spring and was done again

24   in the fall of 2017.  Each event attracted many people to Zona

25   Rosa.  As with any event, the goal was not only were you

attracting people to the event, but that they would stay, have some dinner, shop a little bit, all additional exposure for Zona Rosa.

In the fall of 2017, plaintiff and Mr. Sharbono participated in the Vintage Market Days for their new hobby, the restoring and repurposing of old furniture, and they called it RT Rustics -- Rosemary/Todd Rustics -- to display its products. Plaintiff and Mr. Sharbono paid the booth fee, and plaintiff took time off to participate in the Vintage Market. This was a three-day event. Plaintiff took off time and did this on her own time, one time during her tenure with Zona Rosa.

We also expect the evidence to show that Zona Rosa was going through increasing financial problems. We expect the evidence to be uncontested that Zona Rosa was having financial difficulties and was having trouble making ends meet. Olshan put Zona Rosa up for sale in 2016, and the deal fell through. In the fall of 2017, the financial pressures continued to mount because the lender wasn't agreeing to additional funding. In 2017, Olshan failed to pay a shortfall that it owed Platte County.

Reporters, community leaders, and her staff came to plaintiff and asked Ms. Salerno what was happening. On top of this financial difficulty, there will be evidence that the tenants were also upset because of the continued lack of

1  repairs and Zona Rosa losing tenants.

2          Plaintiff had her annual review by her supervisor,

3  Mr. Barnhouse, in December of 2017 and received an

4  above-expectation review.  She also received a raise associated

5  with this review.  She is fired two months later.  Less than

6  two months later.

7          So what happened to this employee that received a

8  raise, an above-expectations review?  The evidence will be that

9  in January 2018, Olshan Properties' corporate treasurer, a Miss

10 Faye Strobel, came to plaintiff and inquired about cash-flow

11 issues.  Specifically, the money in the Change for Charity

12 account.  The income from the Change for Charity were all the

13 quarters that the patrons pay into the parking meters and money

14 received from the tickets of people that don't pay the meters.

15 The program that raised over $2 million during plaintiff's

16 tenure.  The money that was used to host events for charitable

17 giving at Zona Rosa and, in the past, scholarships and direct

18 donations to charities throughout the years during plaintiff's

19 tenure.

20          The evidence will be that the parties agree that

21 defendant's corporate treasurer called Ms. Salerno on

22 January 30, 2018, six days prior to her termination.  You will

23 hear from plaintiff that she was running late from a meeting,

24 or running late to a meeting and was getting ready to walk out

25 the door when Ms. Strobel called.  Ms. Salerno was surprised to

hear from her, and Ms. Strobel asked her if she understood that there were cash-flow issues at Zona Rosa. When Ms. Salerno acknowledged, she was then told, we need to figure out a way to use the charitable money to cover operating expenses.

The evidence will be that Ms. Salerno was upset at this directive. She indicated she didn't agree and thought it was inappropriate, immoral, and unethical. Ms. Salerno refused this directive and indicated, if you expect me to participate, you will need to find another general manager to do it because this general manager isn't going to. Ms. Salerno will testify that Ms. Strobel disconnected the call.

Ms. Salerno goes along with her work duties and is going to work, and just a few days later on the morning of February 5, 2018, Ms. Salerno receives another call from corporate. The evidence is also undisputed that the highest financial person at Olshan Properties, the Executive Vice President of Finance, Mr. Wayne Chang, who was Ms. Strobel's boss, called Ms. Salerno the morning of her termination.

Ms. Salerno will tell you that Mr. Chang indicated he was trying to get his arms around the charitable money to understand what operational expenses we could back into the money. Plaintiff will tell you that she told him, if you're going to ask me the same thing Faye asked me, I'll tell you exactly what I told her, which is this is not appropriate. The evidence will also show that Ms. Salerno indicated, my face is

1  on the center, and if we're thinking about doing something
2  illegal with these funds, I am not going to be a party to it.

3          Just a few short hours later, the evidence will be
4  that Mr. Barnhouse and Ms. Tischer, the head of human
5  resources, show up in Kansas City.  You will also learn that
6  they work in the same small office in Ohio as Mr. Chang and
7  that Mr. Chang knew that Ms. Tischer was coming to Kansas City
8  and was told not to tell Ms. Salerno.

9          Mr. Barnhouse and Ms. Tischer come to Kansas City to
10  investigate a complaint that was lodged by an employee at Zona
11  Rosa, a Paula Land.  We expect Miss Land to testify and the
12  evidence to show that while she did -- while she did call Ms.
13  Tischer, she was reporting Todd Sharbono not pulling his
14  weight, but not until human resources started asking questions
15  did it roll into other things related to Ms. Salerno.

16          You will hear that her complaint and reason for
17  calling was her belief that Mr. Sharbono was not performing his
18  job duties at the Zona Rosa holiday lighting.  You will also
19  hear testimony that there are not any contemporaneous notes
20  from this call and, further, no notes from the investigation.
21  The only thing that you will see is the defendant's
22  self-serving report of investigation.

23          Ms. Tischer and Mr. Barnhouse interview Ms. Salerno,
24  and she is forthright and cooperative.  She answers their
25  questions but did not admit to any wrongdoing.  She did not

1  believe that she had done anything wrong, and she gave them the
2  information they asked for.

3          The interview with Ms. Salerno lasted a very short
4  amount of time, and Ms. Salerno goes back to work.  Ms.
5  Salerno, a 24-year -- 14-year employee, is terminated within
6  two hours of the investigation starting.  Ms. Tischer and
7  Mr. Barnhouse talked to Mr. Sharbono and do not speak to anyone
8  else at Zona Rosa before termination.  She is told that she is
9  being terminated for participating in Vintage Market back in
10 September of 2017.  So we're now in February of 2018, and she's
11 told she's being terminated for participating in Vintage Market
12 and poor judgment.

13         You will hear that Ms. Tischer waited several hours
14 on Ms. Salerno to clean out her office and then would not allow
15 her to take the MAXI Awards that had been earned in large part
16 through Ms. Salerno's work.

17         After termination, Ms. Salerno learns that Todd, the
18 male facilities manager, is not terminated.  Further, you will
19 hear testimony that he is told he can participate in Vintage
20 Market Days, so long as it's not on company time.

21         The evidence will be that the male employee was
22 needed.  Plaintiff will testify that she believes she was
23 terminated for being a female manager that refused to
24 participate in finding a way to move the charitable money over
25 to cover a shortfall in operating expenses.

1       Within six weeks of her termination, the money

2  starts to be drained out of the Change for Charity account and

3  is moved over in three lump sums.  Defendants will try to

4  justify that they are reimbursing themselves for labor that

5  employees and security performs.  The evidence will show that

6  the goal was to take as much of the money as possible to cover

7  their financial shortfall.  In September of 2018, Olshan turns

8  over Zona Rosa to the bank.  The evidence will also be that the

9  Olshan employees were retained by the new management company,

10 Trademark.

11      Ms. Salerno filed a charge of discrimination in May

12 of 2018, indicating she believed her termination was

13 discriminatory and retaliatory, and the evidence will show this

14 started additional retaliation by defendant.  The most

15 remarkable retaliation is that the defendants brought a small

16 claims lawsuit against plaintiff relating to maintenance

17 supplies she approved for purchase in early 2017.

18      Let that sink in for a minute.  She didn't purchase

19 these items, she didn't have them at her house, there's no

20 evidence that she used them, and they sue her, but not the male

21 facilities manager, Mr. Sharbono, who actually purchased the

22 items.  Oh, and by the way, the cost of the items they were

23 seeking to recover?  $1,146.

24      They serve her with this lawsuit the Wednesday

25 before Thanksgiving.  She's contacted by reporters about what

 1   is going on.  She's asked by colleagues, what is happening?  It
 2   is reported on in the paper.  Front page, by the way.  Her
 3   reputation is being questioned.

 4           At the small claims trial, the judge rules in favor
 5   of Ms. Salerno, and then the defendant appeals.  They continue
 6   on with this small claims lawsuit until December of 2019 when
 7   they finally give up and dismiss the case.  You will hear
 8   evidence that defendants brought this small claims case because
 9   they believed this plasma cutter and air compressor was
10   purchased by Todd Sharbono and approved by Ms. Salerno and used
11   to make furniture for RT Rustics.

12           You'll hear a lot this week that they'll be focusing
13   on a plasma cutter and a piece of metal that they found at Zona
14   Rosa that has cutouts related to it.  They'll show you lots of
15   pictures of cutouts that a plasma cutter -- that -- part of the
16   goods that Ms. Salerno and Mr. Sharbono have made, one of them
17   is called a pump-can.  You'll see lots of pictures of that this
18   week.

19           The information that you will see, there is no
20   support and no evidence to show that Ms. Salerno used the
21   plasma cutter at Zona Rosa at all.  You won't hear any evidence
22   that she used it.  There is no evidence to support this.  And,
23   further, defendants only sued Ms. Salerno and not Mr. Sharbono
24   after she asserted her rights by filing a charge of
25   discrimination and subsequent lawsuit.  We will show that the

1  facts surrounding this small claims matter was retaliation at

2  its most basic form.

3          We also expect the defendants to try to confuse the

4  issues by throwing many accusations at Ms. Salerno.  We will

5  show that these -- there's ways -- all of these reasons that

6  you will hear are ways to avoid what is undisputed.  Defendants

7  asked their female general manager to participate in illegal

8  behavior, she refused, and six days later she is terminated.

9  When she asserts her rights, she is retaliated against.

10         If you find in favor of Ms. Salerno, then you will

11 be instructed that you must award her compensatory damages.

12 After defendant [sic] was terminated, the evidence will be that

13 plaintiff was able to obtain employment as the general manager

14 at City Market in Kansas City.  The evidence will be that this

15 position did not pay as much as general manager of Zona Rosa,

16 and there is a continued wage loss differential.

17 Unfortunately, this position ended on June 28th of this year.

18         In addition to Ms. Salerno's lost wages and

19 benefits, we will ask you to award this courageous woman full

20 damages for the emotional distress, the damage, and the harm to

21 her reputation associated with being illegally fired after she

22 took an enormous risk standing up and refusing to participate

23 in the scheme to use the Change for Charity funds to cover

24 defendant's financial difficulties.

25         In addition to lost wages and emotional distress, we

1  will prove that the actions of defendant, it wasn't an

2  oversight.  They knew it was illegal to act this way, and they

3  did it anyway.  When Ms. Salerno stood up for herself by filing

4  a charge of discrimination, they retaliated again.  This was

5  intentional misconduct, and we will seek punitive and

6  liquidated damages for the blatant disregard for the law.

7          We will ask you to listen carefully to all the

8  evidence and ask you to find in favor of the plaintiff,

9  Rosemary Salerno, and, with your verdict, tell defendant that

10 they cannot ignore the employment laws of the state of

11 Missouri.

12         Thank you very much for your attention.

13         THE COURT:  Is defendant ready to present your

14 opening statement?

15         MR. LILLARD:  Your Honor, I am.  May I use the

16 podium, Your Honor?

17         THE COURT:  Yes.

18         MR. LILLARD:  And Your Honor, I would like to --

19         Good afternoon, ladies and gentlemen of the jury.

20 I've listened to what the plaintiff's counsel has said that

21 this case is about.  No, that is not why the plaintiff was

22 discharged on February 5, 2018.  Ms. Salerno was discharged

23 because of her own conduct.  Her own conduct.

24         Now, the evidence will show that the truth of this

25 case is rather simple.  It actually overlaps.  Ms. Salerno, the

1  general manager and a very well-paid salaried employee for Zona

2  Rosa, was discharged because she decided in 2017 to start her

3  own craft business, involve her direct subordinate, Todd

4  Sharbono, and then sold her personal business crafts at the

5  Zona Rosa for personal profit.  In fact, at the Vintage Market

6  Days, she made $1,800 for that event alone.

7          In fact, the evidence will show that Miss Sharbono

8  [sic] was engaged in this conduct until the property manager,

9  Paula Land, who you will meet and you will hear her testimony,

10 had the courage to call the HR director in Ohio, Ms. Tischer,

11 who is present today, and complain.

12         Now, Zona Rosa is a million-square-foot shopping

13 center located in the Northland area here in Kansas City.  It

14 has retail shopping, it has restaurants, entertainment,

15 business and office space.  And it also has a residential

16 apartment section that is run or managed by Paula Land.

17         To run that facility, the Zona Rosa only has three

18 managers and less than 20 full- and part-time employees.  The

19 first manager is the general manager, which was Rosemary

20 Salerno; the second was Todd Sharbono, the facilities manager,

21 who was her subordinate; and Paula Land, who was the

22 residential manager on the, over the apartments.  Now, again,

23 each of these managers were salaried employees, they were paid

24 by Olshan, regardless of the number of hours they worked.

25         And I'm using the term Olshan Properties.  That's a

trade name or trade reference for a number of businesses, and
the one that employed Ms. Salerno was called MPI Management,
LLC. That was the employer for Ms. Tischer, Miss Land, and
Mr. Sharbono.

Now, the Zona Rosa was constructed in 2004. It was
created by an investment partnership between, as plaintiff
correctly said, Steiner & Associates and Olshan Properties, and
they created a company called Zona Rosa Development, LLC. At
first, Steiner & Associates operated that center from 2004
until 2010, and it was Steiner & Associates that hired the
general manager, Ms. Salerno, in 2004 to lead that shopping
center.

However, as the evidence will show, the shopping
center was very expensive and was what's called overleveraged,
meaning the cost of building it and paying the mortgage was
more than the revenue that was being generated by that entity,
and it had been struggling since its construction to be
profitable.

In an attempt to change that in 2010, the Olshan
side decided to take over the management of the company by
using MPI Management, LLC, and to run the property instead of
Steiner. When it did that, it took over the employment of Ms.
Salerno, who now worked for them in 2010.

Now, under MPI Management, the Zona Rosa was still
having issues with profitability for the cost of the structure;

1    and in 2016, Olshan put it up for sale.  After no buyers, the

2    property was then transferred back to the bank on September 12,

3    2018, and the defendants ended their ownership and management

4    of the Zona Rosa.

5            Now, MPI Management, LLC, or Olshan Properties, is a

6    company that was started in 1955 by Morton Olshan and now is

7    run by his daughter, Andrea Olshan, who is the CEO.  MPI

8    Management has an HR director -- again, Ms. Tischer -- who is

9    based in Columbus, Ohio, and the business had written

10   employment policies that provide -- provided to its employees,

11   including Ms. Salerno, and it requires each of them to follow

12   those policies.

13           And one of those policies is a pretty common one,

14   one that you may have for your own employer.  It's a

15   conflict-of-interest policy, and it simply says, in black and

16   white, you are not permitted to perform outside work or to

17   solicit personal business on Olshan Property premises.

18           Now, the evidence will show that the plaintiff was

19   aware of this policy and, in fact, she signed an acknowledgment

20   that she reviewed and understood it.  But, despite this policy,

21   the evidence will show that in 2017, Rosemary Salerno, again,

22   the general manager for the center, started her own craft

23   business with her facilities manager, Todd Sharbono, and that

24   they called it RT Rustics -- again, R for Rosemary and T for

25   Todd -- and they made crafts for craft shows in the area.

1      One of those craft shows was the Vintage Market Days

2 that promotes events such as that.  It sells booth space and

3 offers booths for craft businesses to sell their items for a

4 fee.  Rosemary Salerno hosted Vintage Market Days and then

5 purchased the booth for her own personal business at the Zona

6 Rosa.

7      Which, by the way, the evidence will show Rosemary

8 Salerno now owns the franchise Vintage Market Days for Kansas

9 City.  That's her business now.

10      In the fall of 2017, Rosemary used her general --

11 again, her GM position at the Zona Rosa to host Vintage Market

12 Days, to purchase the booth, and then sold her business crafts

13 for her own personal gain.  And as I indicated, the evidence

14 will show she made $1,800 at that event alone.

15      And that wasn't all.  Now, clearly, that was a

16 violation of the conflict-of-interest policy that Olshan had,

17 and she was terminated for that.  Again, but that was not all.

18      Now, it is possible that Olshan Properties would not

19 have known anything about plaintiff's personal business

20 activity, had it not been for the property manager, Paula Land,

21 who called and complained.  And she complained about that, but

22 that wasn't all.

23      She also claimed when she called the HR director

24 that Ms. Salerno was favoring her subordinate, Todd Sharbono,

25 or Sharbono, to the point it was making staff uncomfortable.

 1 She said that they were practicing swing-dancing lessons at

 2 work.  That they were taking time off together, they were

 3 taking lunches together, they were displaying affection at

 4 staff meetings.  That they had started this craft business

 5 together.  They were refurbishing and selling furniture and

 6 other items together.  That he was -- she was taking him to

 7 chamber of commerce meetings during work hours.  That she was

 8 taking him to evening events.  That she had him drive an RV

 9 from Florida back to Kansas City without knowing whether he

10 took personal time.  And then what she says broke the straw's

11 back was she was selling craft items, these craft items at a

12 police charity event when other staff were struggling to try to

13 get the lighting working for the upcoming Christmas activities.

14 That's what she complained about.

15            Now, in fact, with regards to taking time off

16 together with Mr. Sharbono, the evidence will show that

17 plaintiff Salerno was given a written reprimand just eight

18 months earlier for taking Mr. Sharbono and most of the staff to

19 Las Vegas for five days for awards ceremony without advance

20 permission.  The evidence will show that the concern was both

21 the -- that both of these commercial managers for the retail

22 property, Ms. Salerno and Mr. Sharbono, were absent from Zona

23 Rosa during those five days.

24            And the facts will show that Ms. Salerno was told

25 that if she took off time with Mr. Sharbono again and left no

manager present, she would be fired.  We will show you that
documentation that was provided to Ms. Salerno, and it was very
clear what they said is if you are not there, then he needs to
be there; and if he's not there, then you need to be there.
And if you do that again, you will be terminated.  And that was
eight months prior.

Now, the evidence will show that after Miss Land
complained in her call to Janetta Tischer, the HR director, Ms.
Tischer, and the plaintiff's direct supervisor, Mr. Barnhouse,
flew to Zona Rosa.  They're both located in Columbus, Ohio.
And they went to Zona Rosa on February 5th, a few days after
the complaint, and asked Ms. Salerno if those allegations were
true.

They asked her, did you sell craft items for your
personal business at Zona Rosa for personal property profit?
And she said yes.

They said, did you engage in swing-dance lessons in
the office workplace with Mr. Sharbono at work?  And she said
yes.

And they said were you taking time off together and
going to evening events and lunches together, time off together
when we told you not to do that eight months before?  And she
said yes.

And did you allow Mr. Sharbono to fly to Florida,
drive an RV back, and did he take personal time that you would

1  have to authorize?  She said, I didn't know if he did or not.

2         And for those admissions to Miss Land's complaint to

3  HR, Ms. Salerno was terminated that day after those admissions.

4         Now, even after Ms. Salerno was terminated and time

5  passed, they found out more.  One, they learned that Ms.

6  Salerno had authorized the purchase of a plasma cutter and a

7  large compressor with Olshan funds.  Now, she's the one that

8  has to authorize the purchase, no matter who on her staff

9  requested.  And this plasma cutter is a device that no other of

10  their shopping centers have ever owned, had ever purchased,

11  that it appeared to have no use for the center, and, in fact,

12  was never used for any center purposes, and was the exact same

13  equipment that the Plaintiff Salerno used in her very craft

14  business to make these pump-cans.

15         In fact, this is a photograph of the booth -- of her

16  booth that she created for her business at the Zona Rosa in

17  which she was selling her craft items.  And these are the

18  pump-cans that she was making for the plasma -- using the

19  plasma cutter to manufacture them.

20         Now, they discovered this after they terminated her

21  because they found a piece of scrap metal left behind at the

22  Zona Rosa that was used to practice on.  It had, if you look at

23  it carefully, the triangle cutouts for the pump-can eyes and

24  the R for Rosemary.

25         After Ms. Salerno's termination, the defendant also

learned that Ms. Salerno had asked one of their part-time employees, an employee named Madelyn Bowden, to staff her booth for her business at the Vintage Market Days event at that location without paying her.

Now, both Mr. Barnhouse, Ms. Salerno's immediate supervisor, and Ms. Tischer will testify that, had they known about those additional issues, the purchase of the plasma cutter and the large compressor to go with it, as well as having a part-time employee staff her booth, they would have discharged her for that, also.

Now, lastly, both Ms. Tischer and Mr. Barnhouse will testify that they recommended to the CEO, Andrea Olshan, that she be terminated. The parking-meter stuff is a red herring. She's using that to cover up the facts of her own behavior, which is simple. She started her own business, sold her business wares at the Zona Rosa, and was terminated for violation of the policy.

Both Ms. Tischer and Mr. Barnhouse will testify that they had no knowledge of parking meters or any conversation the plaintiff may have had with other Olshan accountants until after Ms. Salerno was terminated, and it had nothing to do with the reasons for discharging the plaintiff. Ms. Salerno was discharged because of her own conduct, because she started her own craft business and involved her direct subordinate, Todd Sharbono, or Sharbono, and then sold her personal craft

1  business at the Zona Rosa for personal profit.

2          Parking meters.  There were parking meters on the

3  private property of the Zona Rosa.  People put money into it,

4  some of that money goes to charity.  There was an original

5  agreement with Steiner & Associates that says that you can take

6  the expenses that you incur for, you know, picking up the

7  parking-meter funds, to hiring the staff to do the funds, all

8  the maintenance and other expenses, and offset that revenue

9  before you pay it.

10         Prior to the sale and turning back to the bank, they

11  wanted to make sure that their accounts were accurate, that

12  they had booked all of the expenses to match the revenue.  And

13  so they did call her and ask her, do you have a copy of the

14  agreement?  What are the expenses?  They had that

15  communication.  You will hear the testimony of the accountant,

16  who no longer is employed by Olshan, who will tell you why he

17  called her, why he was doing that and what they were doing, and

18  there was nothing inappropriate about it.  And the kicker is

19  Ms. Tischer and Mr. Barnhouse had no knowledge of that until

20  after they terminated her.

21         At the conclusion of this case and after you

22  consider the evidence, I'll ask you to render a verdict in

23  favor of the defendants.  Thank you for your attention.

24         THE COURT:  Is the plaintiff ready to call your

25  first witness?

1       MS. DICKSON:  Yes, Your Honor.  Plaintiff calls

2  Rosemary Salerno.

3       THE COURT:  Ms. Salerno, could you come forward to

4  about that area right there, and LaTandra will swear you in.

5                           - - -

6                     ROSEMARY SALERNO,

7   being first duly sworn by the courtroom deputy, testified as

8  follows:

9       THE COURT:  If you can take a seat right there.  And

10 once you get there and get seated and get settled, if you could

11 take your mask off during your testimony, I would appreciate

12 it.

13                          - - -

14                    DIRECT EXAMINATION

15  By Ms. Dickson:

16  Q.     Please introduce yourself to the jury, Ms. Salerno.

17  A.     My name is Rosemary Alise Salerno.

18  Q.     And where do you live?

19  A.     I live in Kansas City, Missouri.  I'm a lifelong

20 Northland resident of Kansas City.

21  Q.     Describe for me your background growing up in Kansas

22 City.

23  A.     I attended Winnetonka High School.  I went to the

24 University of Missouri at Kansas City.  I was on a cello

25 scholarship and attended the conservatory there, and started

1  working after graduating college.

2  Q.     Are you currently married?

3  A.     I am.

4  Q.     What is your spouse's name?

5  A.     His name is Dudley Wade.

6  Q.     How did you meet?

7  A.     Dudley and I actually met at the conservatory of music.

8  Dudley is a French horn player, and we were in the conservatory

9  orchestra together.

10  Q.     Tell me about your family.

11  A.     Well, like I said, I'm married.  We don't have any

12  children.  We have two dogs.  I have one brother who also lives

13  here in Kansas City, and he has two daughters, my two nieces.

14  And both of my parents are deceased, so we have a pretty small

15  family.

16  Q.     You had mentioned that you play the cello.  Talk to me

17  about the interests that you have.  What drew your interest in

18  school?

19  A.     I'm sorry?

20  Q.     What drew your interest in school?

21  A.     So I've always thought of myself as a pretty creative

22  person.  I started taking -- my mom made me start taking piano

23  lessons at age five, and music was kind of an important part of

24  my life growing up, and still is, actually.  I started on cello

25  on age 11, and I still play today.  Not as much as I'd like,

1  but I still do.

2         And I just, I kind of pursue lots of different

3  creative interests.  I worked -- I took lessons, actually, when

4  I was seven or eight, or took classes on cake decorating and

5  never did anything with that until I went to college and

6  actually had a part-time job all through college decorating

7  cakes.  That's how I made extra money in college, as well as

8  teaching private cello lessons.  So...

9  Q.     And do you participate with a string quartet, or did

10 you?

11 A.     I did, and I do occasionally now.  I'm kind of a guest

12 artist sometimes.  It's just -- you know, I did a lot through

13 college, and after college life kind of gets busy.  And I was

14 the only kind of non-music major.  The other three people in my

15 quartet are all teach -- string teachers, and I'm kind of the

16 shopping center manager, so I didn't have as much time.  So I

17 do play, and I still play occasionally, yes.

18 Q.     And so tell us about your degree.  What is your degree

19 in?

20 A.     My degree is in communication studies, and I also have

21 a minor concentration in music, which just means I have a whole

22 lot of hours of music classes that didn't add up to any

23 specific degree.

24 Q.     I'd like you to look at Exhibit 4, please.  And that

25 should be right in front of you in that binder.  And I'll

1  represent to you that Exhibit No. 4 is your resume.

2  A.      Yes, it is.

3  Q.      And this was your resume in 2018, correct?

4  A.      Yes, it was.

5          MR. LILLARD:  One moment, Your Honor, we don't have

6  a copy of their exhibits at the table.  Do you have a copy of

7  the exhibits?

8          MS. DICKSON:  We shared them electronically.

9          MR. LILLARD:  Thank you, Your Honor.

10          MS. DICKSON:  I would move for Exhibit 4 to be

11  entered into evidence.

12          THE COURT:  Any objection?

13          MR. LILLARD:  One moment, Your Honor.  No objection,

14  Your Honor.

15          THE COURT:  Exhibit 4 will be admitted.

16          (Plaintiff's Exhibit 4 was admitted into evidence.)

17  BY MS. DICKSON:

18  Q.      Ms. Salerno, we're going to show you Exhibit 4 because

19  I'd like to talk to you about the jobs that you had prior to

20  Zona Rosa.

21  A.      Okay.

22  Q.      While we're pulling this up, how did you become

23  interested in shopping center retail?

24  A.      So I was at UMKC majoring in communications, like I

25  said; and in order to graduate, I had to do an internship.  And

this was back many years ago, and I remember there was a wall with a bulletin board that had different internships posted on it.  This was pre-computer time.

And there was a position for a shopping center close to where I lived, Antioch Shopping Center, and the position was for a summer intern.  And I thought, hey, that sounds like fun. It will be close to home.  It was literally blocks from my house, I had grown up going to that shopping center, and I liked to shop.  So it seemed like a good fit, and I signed up.

Q.    And did you like it?

A.    I loved it.  And I was a senior at that point, and I really didn't know what I was going to do.  And I thought, aha, I think I've found my career path.

Q.    And so what did you do next after college?

A.    Well, I couldn't find a job in the shopping center business, unfortunately, so next I took a job in retail.  I had a friend who worked at Saks when Saks Fifth Avenue was on the Plaza, and she told me they were hiring and asked if I would be interested.  At that point, I had graduated, and I didn't have a job, so I thought that would be a great opportunity.  So I started at Saks as a sales associate.

Q.    How long did you work there?

A.    I worked there for about three years in its entirety, but I worked at Saks for a year, and then I became an assistant manager.  Louis Vuitton Handbags had a lease department in that

1  store, so I became an assistant manager and actually employed
2  by Louis Vuitton for two years of those three.
3  Q.    What did you do after that?
4  A.    So I left there because I finally got my shopping
5  center job.  I was still pursuing that the whole time I was
6  working retail.  I still wanted to work in a shopping center,
7  in an office of a shopping center, so I finally was hired.  I
8  had tried sending resumes and got called for an interview at
9  Independence Center, and I was hired as the assistant marketing
10 director in April of '92.
11 Q.    And what were your jobs as the assistant marketing
12 director?
13 A.    I helped with events.  I helped manage the customer
14 service staff; we would have activities at the holiday time,
15 Santa Claus; we worked with a local Optimist Club to run a
16 train, so I helped with that; and just helped overall market
17 the shopping center.
18 Q.    And how long did you stay in that position?
19 A.    I was there until '95.
20 Q.    And what happened in 1995?
21 A.    So shortly before I left Independence Center, I was
22 called by a company that was building a new outlet mall on the
23 eastern side of town called -- at that time, it was called the
24 Kansas City Factory Outlets.  And they called and asked if I
25 would being interested in interviewing for the general

1 manager's position.

2  Q.      What was your response?

3  A.      Well, my first response was I'm not -- I don't know

4 that I'm a general manager, I've been a marketing director my

5 whole career in the marketing field.  And they said, no, quite

6 the contrary, we want people -- we hire people that have a

7 marketing-based background because we feel like that's an

8 important skill set in that we can kind of teach you and grow

9 you on the operational side.  So I interviewed, and I got the

10 job.

11  Q.      And so tell the jury about the Prime Outlets in Odessa.

12 What was your job there as general manager?

13  A.      Well, it was about a 300,000-square-foot center, and it

14 was built in two phases.  But we opened in '95, and it was kind

15 of at the height of the outlet boom.  There were outlet malls

16 opening everywhere, and people were really into outlet

17 shopping.  And it was a very, very successful center for many

18 years.

19          And similarly as you'll hear with Zona Rosa, second

20 phase was built, and that was a challenge and never got fully

21 leased up, and there were challenges with that second phase.

22 And kind of the outlet industry as a whole kind of shrank.

23 And, you know, we had some challenges at the end from -- for

24 getting customers all the way out to Odessa.

25          But overall, it was a great success for a lot of

1 time.  And I learned -- that's where I kind of cut my

2 operational chops, so to speak.  I learned how to do the

3 operational part of a GM position.

4  Q.     And did you enjoy that?

5  A.     I did.  I enjoyed it greatly.  I loved the Odessa

6 community.  I still get the Odessa paper all of these many

7 years later because I met so many people out there, and it was

8 a great experience for me because it was kind of my first

9 opportunity -- I started at that center two months before the

10 opening, and it was kind of a ground-up opportunity to open

11 that center and develop a team and develop the programs for

12 that shopping center.

13  Q.     And how long were you employed there?

14  A.     I was there for about nine years.

15  Q.     And where did you go after the outlet mall in Odessa?

16  A.     From there, I went to Zona Rosa.

17  Q.     So tell us, how did you apply for the job at Zona Rosa

18 as general manager?

19  A.     So I had heard for, actually, years before it opened --

20 being a Northlander, like I said, there was a sign on the

21 corner of I-29 and Barry Road that said Zona Rosa for years

22 leading up to the opening, so we knew that something was coming

23 that was going to be a shopping something.

24          And then I saw an ad advertising the general

25 manager, and I heard that Steiner & Associates was the

1 developer/manager for the property. And Steiner has a great

2 reputation in the industry. They developed a center called

3 Easton Town Center in Columbus, Ohio, which is -- I don't know

4 if it still is, but it was one of the top ten shopping centers

5 in the United States.

6          And so I thought, wow, if this is going to be

7 anything like Easton, it's going to be a great center. And

8 it's literally ten minutes from my house. I was commuting

9 about 45 minutes each way because I was still living in the

10 Northland and driving to Odessa. So I thought it was a great

11 opportunity, so I sent in a resume.

12 Q.     So let's talk about some of the designations that

13 you've received, professional designations that you've

14 received. I'm going to -- I understand that you are a CRX.

15 What does that mean?

16 A.     That's a Certified Retail Executive.

17 Q.     And additionally, you also have a CSM certification.

18 What is that?

19 A.     Certified Shopping Center Manager.

20 Q.     And a CMD?

21 A.     Certified Marketing Director.

22 Q.     So what's the reason why you would get these

23 professional designations?

24 A.     Well, ICSC, the International Council of Shopping

25 Centers, is kind of the governing body for the industry, and

1  they have these professional designations that just, you know,

2  gives you a -- if you achieve these designations, it kind of

3  gives you recognition as an expert in your field.

4          It involves taking a really horrible test on all of

5  them that I dreaded and -- but I thought it was a good thing to

6  do, and I -- my supervisors thought it was a good thing for me

7  to do, so it was a goal that I had set to achieve these

8  designations.  And I took the tests at various times throughout

9  my career and passed the tests.

10  Q.     Now, moving back to the time period when you are

11  applying for a position at Zona Rosa, and I believe that you

12  had indicated that was before Zona Rosa had even opened?

13  A.     When I applied?

14  Q.     Yes.

15  A.     Yes, uh-huh.

16  Q.     When did you receive the position?

17  A.     I received -- I started in March of 2004.

18  Q.     So tell me what it was like during those first few

19  days, months of your employment as a general manager at Zona

20  Rosa.

21  A.     So I was -- I started in March, the center opened in

22  May, so it was a lot of -- again, kind of going back to Odessa

23  where I started the center a couple months before opening, it

24  was the same sort of thing, but this was on a completely

25  different scale.  This was over 500,000 square feet.  I had an

1  extremely small staff in Odessa, and I had a little bit bigger

2  staff, not much bigger, at Zona Rosa.  But I was able to hire

3  the team, really develop kind of everything from setting up our

4  initial offices, working with all of the original tenants of

5  the center, and just getting everything ready to go for what we

6  had, which was a big grand opening event that took place when

7  the center opened.

8  Q.    And when you say grand opening event, what did that

9  entail?

10  A.    Oh, just promotions and activities with the various

11  tenants and for the community.  We developed and started the

12  Change for Charity program and, you know, worked with the

13  tenants and worked with third-party contractors to get the

14  landscaping in and get the center, you know, ready to go for

15  the grand opening events.

16  Q.    What was it about the possibilities and the challenges

17  of Zona Rosa that were interesting to you?

18  A.    Well, I had always done retail shopping, and what I

19  liked about Zona is that it was incorporating residential for

20  the first time, which I had never done in my career.  So we

21  actually had apartments at Zona Rosa that people leased, and

22  that's where they lived.  And also it had office space, which

23  was another part of the business that I had never -- I had

24  never experienced.  So I was excited to learn that part and

25  understand it.

1  Q.      And I'll now ask you to look at Exhibit No. 87.  And

2  this is your job description as general manager?

3  A.      Yes.

4  Q.      And this is what you understand your job duties to be

5  during the time that you were at Zona Rosa?

6  A.      Yes.

7          MS. DICKSON:  I would move for Exhibit 87 to be

8  admitted into evidence.

9          THE COURT:  Any objection?

10         MR. LILLARD:  One moment, Your Honor.  No objection,

11 Your Honor.

12         THE COURT:  Exhibit 87 will be admitted.

13         (Plaintiff's Exhibit 87 was admitted into evidence.)

14         MS. DICKSON:  I don't believe I asked last time.  Is

15 it okay to present the evidence after it's been admitted?

16         THE COURT:  Yes.  And you in the future don't need

17 to ask.

18         MS. DICKSON:  Thank you.

19 BY MS. DICKSON:

20 Q.      Ms. Salerno, Exhibit No. 87 indicates the job

21 description of a general manager, and I'd like you to kind of

22 tell us what you did on a daily basis during the time period --

23 and I understand that it may be different at the beginning of

24 your tenure at Zona Rosa and towards the end of your tenure,

25 but let's start off when the center was opening.  What were

1  your job duties as general manager?

2   A.      So I was charged with developing this new kind of

3  community hub.  My supervisors at the time wanted me to make

4  Zona Rosa the community gathering spot.  They -- you know,

5  there had not been -- the old Metro North Mall, if any of you

6  are familiar with that, was kind of going away or having

7  struggles, and Steiner wanted to develop Zona Rosa to be the

8  hub for the community, that was the charge.  And to bring some

9  tenants who had not been represented in the Northland before to

10 that market, including a lot of restaurants, which the

11 Northland had been woefully underserved in the restaurant arena

12 for many years.  So bringing those types of tenants and

13 bringing that development to life was my No. 1 charge.

14  Q.      Was it easy?

15  A.      No, it wasn't.

16  Q.      Did you enjoy it?

17  A.      I loved it, yeah.

18  Q.      Why?

19  A.      You know, I was -- like I said, I grew up in that

20 community, but up until that point, I had never worked in that

21 community, I'd always worked outside of the Northland.  So it

22 was really special to get to live and work in the same

23 community and getting to be a part of the business community

24 and getting to know folks in the business community and

25 community leaders and partners that we developed over the

years.

So, yeah, it's kind of a constant juggling, running a shopping center, I say. You're constantly dealing with operational things and marketing things and tenant things and issues and concerns.

And then adding residential to the mix, I had never managed residential, and I quickly found that when people live somewhere, then they have lots of needs all the time, and those needs are 24/7, all the time. And whether it was a call in the middle of the night because somebody's, you know, hot water heater quit working and they couldn't take a shower -- I mean, there were just -- it was a constant environment, 24/7, and something was always happening. So -- but I loved -- that's what I loved about it.

Q. So how was Zona Rosa, what was your understanding when you were hired in as the general manager about the ownership and the management of the property? How did that work?

A. So I worked for Steiner & Associates, and, you know, I didn't -- I knew that there was a group, Mall Properties, MPI, that was involved financially with the project, but I didn't know to what level or extent. I worked for Steiner. Steiner is the one I talked to every day, folks with Steiner & Associates. I had limited interaction with anybody from Mall Properties. But they showed up for our grand opening and would come to the center maybe once a year to check on their

1    investment, and had very limited involvement with them for the

2    first six years of my employment there.

3    Q.    And who was your employer with Steiner -- who was your

4    supervisor with Steiner & Associates?

5    A.    I worked for a gentleman the whole time I was there by

6    the name of Beau Arnason.

7    Q.    And if you look at Exhibit No. 87, I believe was

8    Mr. Arnason's position the Vice President of Asset Management?

9    A.    Can you say that again?

10   Q.    Exhibit 87?

11   A.    Uh-huh.

12   Q.    You said that you reported to Mr. Arnason.  Was he the

13   vice president --

14   A.    Yes.

15   Q.    -- at Steiner?

16   A.    Yes.

17   Q.    Did your supervisors change while you were employed

18   with Steiner & Associates before Olshan Properties took over

19   your employment?

20   A.    No.  Beau was always my supervisor.  At one point, a

21   gentleman by the name of David Wass came in, and he was

22   actually the GM of the Easton Center, and he kind of helped

23   Beau with Zona Rosa, but I still reported technically to Beau.

24   Q.    Now, that management structure would have changed in

25   2010 when Olshan Properties took over the management and you

1  became an employee, correct?

2   A.      Correct.

3   Q.      And so tell me about -- were you grandfathered in?

4   A.      Yes.

5   Q.      And what did that mean to you?

6   A.      That just meant that my benefits, everything, they told

7  me would continue back to my original hire date, which was

8  March of '04.  So with Olshan, like with a lot of companies, if

9  you're there longer, you might get extra time off or -- I'm

10  trying to think what other, like, benefit there was, other than

11  the tenure.  They were recognizing the tenure on the property.

12  So even though I was only technically becoming their employee

13  in 2010, they were recognizing me as an employee back to 2004.

14  And all of the employees on our team who came over were all

15  grandfathered with their original start date at the property,

16  not the 2010 date with Olshan.

17   Q.      Let's talk about your compensation related to your job

18  duties as general manager.  When you came to Zona Rosa, what

19  was your compensation?

20   A.      I believe it was right around $80,000 a year.

21   Q.      And was there any type of bonuses or commissions that

22  you received?

23   A.      Yes.  I would get a discretionary bonus just at the end

24  of the year at review time, and it -- you know, at that time it

25  wasn't really tied to any sort of performance or anything like

1   that, it was just a discretionary bonus.

2    Q.      And did that compensation package increase through the

3   years?

4    A.      Oh, yes, uh-huh.

5    Q.      After Olshan took over as your employer in 2010, who

6   was your supervisor then?

7    A.      It started out with a gentleman by the name of Mike

8   Makinen.

9    Q.      And let's talk about the structure of the reporting

10  that you would have at Olshan Properties.

11   A.      Uh-huh.

12   Q.      How did the structure work at Zona Rosa management-wise

13  during that time frame where Mr. Makinen was your supervisor.

14   A.      How was the structure at Zona Rosa?

15   Q.      First.  Yes, as far as general manager and other

16  managers on site.

17   A.      Sure.  So I was the general manager.  At that time,

18  there was a position called director of operations that

19  reported to me, as well as a director of security that reported

20  to me.  Then security had a team of people under them, and also

21  the director of operations had facilities-type of people under

22  him.

23          We also had a guest services manager, who had folks

24  under her that ran kind of our guest services/customer service

25  area.  We had a marketing assistant, we had an administrative

1  assistant, and we had an accounting manager, director of

2  accounting, I can't remember the title, that was at the

3  property, as well. And I think that's -- at the beginning,

4  that's pretty close to what we had.

5  Q.     And so then your supervisor, Mr. Makinen, what was his

6  position with Olshan?

7  A.     I believe his title was Chief Operating Officer.

8  Q.     And how long did he stay your supervisor?

9  A.     I think he was there for about four years, pretty close

10  to four years.

11  Q.     And after he stopped being your supervisor, did you

12  have many other supervisors throughout your tenure with Zona

13  Rosa?

14  A.     Yes, there were quite a few.

15  Q.     Did your supervisors have different ways of handling

16  matters related to Zona Rosa?

17  A.     Oh, yes.

18  Q.     Tell us about that.

19  A.     Well, it's just, you know, every time there was a

20  change, there would be different expectations or different ways

21  of doing things, and, you know, we, myself and my team, always

22  adapted however we had to to that particular person.

23        But, you know, some -- like with Mike, we would have

24  maybe weekly calls that would be half hour, 45 minutes on

25  updates on the center, and over the years I would have

1  supervisors that would want to have three-hour calls during the

2  week, and others that would maybe have ten-minute calls.  So it

3  just depended on whoever the supervisor was and whatever their

4  level of involvement that they wanted with the day-to-day

5  activities.

6          But, yeah, it did change, depending on who was in

7  charge, I guess.

8  Q.      Do you believe that you did a good job in this role?

9  A.      Yes.

10  Q.      Why did you believe that?

11  A.      You know, I gave 110 percent to Zona Rosa and to my

12  employer all the time.  As I spoke earlier, it was not just an

13  8:00-to-5:00 job.  It was seven days a week.  I would be out

14  there on weekends attending to events.  We were very

15  event-heavy at Zona Rosa.  So whether it was a concert in the

16  evening to an event during the weekend, I was there.  I wasn't

17  going to expect my team to be at something that I wasn't, and

18  it was a lot of work.  But I loved it, and I loved being a part

19  of the community and getting involved with the community

20  partners that we did get involved with.  And so that was the

21  aspect of it that I loved.

22  Q.      And you received -- did you receive employment

23  evaluations throughout your years as general manager of Zona

24  Rosa?

25  A.      Yes.

1  Q.     And do you believe these to be favorable reviews?

2  A.     Yes.

3  Q.     And were there salary increases associated with these

4  reviews?

5  A.     There were, yes.

6  Q.     Were there times where you didn't receive salary

7  increases?

8  A.     I don't think so.  I think I always got something.

9  Q.     I'd like you to look at Exhibit No. 6, please.  And

10 this is one of your reviews from the 2013/'14 time frame where

11 you were general manager of Olshan Properties, correct?

12 A.     Yes.

13 Q.     And at that time, you had a Mr. Jaeger as your

14 supervisor?

15 A.     Yes.

16        MS. DICKSON:  I would move for Exhibit No. 6 to be

17 admitted into evidence.

18        THE COURT:  Any objection?

19        MR. LILLARD:  No objection, Your Honor.

20        THE COURT:  Exhibit 6 will be admitted.

21        (Plaintiff's Exhibit 6 was admitted into evidence.)

22 BY MS. DICKSON:

23 Q.     So tell me about Mr. Jaeger and his tenure as your

24 supervisor.

25 A.     So Mr. Jaeger was another general manager at a center;

1  and when Mr. Makinen, Mike Makinen, things got kind of super

2  busy for him, so he put Chris, Mr. Jaeger, into kind of a

3  senior-level position, so he actually oversaw myself and a

4  couple of the other general managers.

5  Q.     And how long did he stay your general -- or your

6  supervisor?

7  A.     Well, he stayed after -- Mr. Makinen left, I think, in

8  around 2014, like I said, and I don't think Chris stayed too

9  much longer after that.  He wasn't -- he wasn't around too much

10  longer after Mr. Makinen left.  Maybe a year?  It's hard to

11  remember, but it wasn't that long.

12  Q.     And when he gave you this review that's in Exhibit

13  No. 6, do you remember one of the things that he had indicated

14  to you about being a fair and ethical leader?

15  A.     Uh-huh.

16  Q.     Do you understand that that was an expectation of your

17  job?

18  A.     Oh, yes.

19  Q.     Now, after Mr. Jaeger was your supervisor, who was your

20  next supervisor?

21  A.     After Mr. Jaeger was a lady by the name of Lynn

22  Meredith.

23  Q.     And had you had a reason or anything to deal with Miss

24  Meredith before she became your supervisor through your

25  employment at Olshan?

1  A.    Yes.  So Lynn was actually in a senior-level marketing

2  role, I think, for the whole company, so she kind of oversaw

3  marketing for Olshan in general, and she worked not only with

4  the town centers, like Zona Rosa, but some of the other --

5  Olshan has hotel properties and many other types of properties,

6  and I think she had kind of an overall role helping with

7  marketing for the entire company.

8  Q.    And I would ask you to look at Exhibit No. 8 now.

9  A.    Okay.

10 Q.    And could you identify this?

11 A.    This was a six-month performance evaluation from Lynn

12 Meredith.

13 Q.    And the date on this is April 19, 2016?

14 A.    Yes, that's correct.

15         MS. DICKSON:  I would ask for Exhibit No. 8 to be

16 admitted into evidence.

17         THE COURT:  Any objection?

18         MR. LILLARD:  No objection, Your Honor, to

19 Exhibit -- Plaintiff's 8.

20         THE COURT:  Exhibit 8 will be admitted.

21       (Plaintiff's Exhibit 8 was admitted into evidence.)

22 BY MS. DICKSON:

23 Q.    And, Ms. Salerno, I'll call your attention to, under

24 the leadership abilities, when Miss Meredith is evaluating you,

25 there is a mention of your community involvement.

1  A.      Uh-huh.

2  Q.      And being one of your greatest strengths.

3  A.      Uh-huh.  Yes.

4  Q.      Why was community involvement important?

5  A.      Well, it was important for us as a business in the

6  community to partner with various organizations and

7  institutions in the community to make the community a better

8  place for everybody.  We wanted to make Zona Rosa a hub, and we

9  wanted it to be a place where people wanted to go, and we

10  wanted to partner with folks throughout the community to

11  achieve that.

12  Q.      And you believed this to be one of your job duties as

13  general manager, correct?

14  A.      Correct.

15  Q.      And did you receive favorable feedback from your

16  employer that you were good at this?

17  A.      Absolutely.

18          THE COURT:  Why don't we take our afternoon break

19  now.

20          Ladies and gentlemen, we're going to take a

21  15-minute break.  You've now heard opening statement, you've

22  heard a little bit of evidence in this case.  It's going to be

23  your first temptation to talk about the case among yourselves,

24  and I would urge you to resist that temptation.  It's important

25  that until you have this case, hear all of the evidence in this

1  case and this case is sent to you for deliberations, that you

2  not discuss this case among yourselves, do not discuss the case

3  with anyone else, do not permit the case to be discussed in

4  your presence.

5          We will be in recess until 3:15.

6          (The following proceedings were had in the courtroom

7  out of the presence of the jury:)

8          THE COURT:  Is there anything that I can take up

9  during this break?  Ms. Dickson?

10         MS. DICKSON:  Not for the plaintiffs.

11         THE COURT:  Mr. Lillard?

12         MR. LILLARD:  Nothing at this time, Your Honor.

13         THE COURT:  Okay.  Then we'll be in recess until

14  3:15.

15         (A recess was taken from 3:01 p.m. to 3:18 p.m.)

16         THE COURT:  Are we ready to bring the jury back?

17         MS. DICKSON:  Yes.

18         COURTROOM DEPUTY:  Yes, Judge.

19         THE COURT:  Okay.  Then let's bring them in.

20         (The following proceedings were had in the courtroom

21  in the presence of the jury:)

22         THE COURT:  Ms. Dickson, are you ready to proceed?

23         MS. DICKSON:  Yes, Your Honor.

24                        - - -

25

1              RESUMED DIRECT EXAMINATION

2    By Ms. Dickson:

3    Q.    Ms. Salerno, prior to the break, we were discussing

4    some of the performance reviews that you've received throughout

5    the years during your tenure at Olshan Properties and at the

6    Zona Rosa location in Kansas City, and we had discussed some of

7    the managers that you had had throughout your tenure.

8              After Miss Meredith was your supervisor, who was

9    your next supervisor?

10   A.    Steve Barnhouse.

11   Q.    And did you know Mr. Barnhouse?

12   A.    I did.  He was from Kansas City originally and worked

13   for another developer here in town called RED Development so I

14   knew him peripherally just from kind of being in the same

15   business and in the same community.  So I did know him, and he

16   had reached out to me prior to being hired at Olshan.

17   Q.    And he became your direct supervisor when?

18   A.    I'm not exactly sure.  It was probably sometime in late

19   '16, '17.

20   Q.    And so I'll ask that you look at Exhibit No. 7, please.

21   A.    Okay.  Uh-huh.

22   Q.    And Exhibit No. 7 is from the 2015 to '16 time frame.

23   And if you look at the manager, it indicates Mr. Barnhouse; is

24   that correct?

25   A.    Yeah, and I think he came shortly before this review.

1  So I think it was late -- it was probably mid to late '16.

2              MS. DICKSON:  I would move for Exhibit 7 to be

3  admitted into evidence.

4              THE COURT:  Any objection?

5              MR. LILLARD:  One moment, Your Honor.  There's no

6  objection to admitting Plaintiff's Exhibit 7, Your Honor.

7              THE COURT:  Exhibit 7 will be admitted.

8              (Plaintiff's Exhibit 7 was admitted into evidence.)

9  BY MS. DICKSON:

10  Q.      And so Mr. Barnhouse comes in towards the end of this

11  review period that has been admitted into evidence, Exhibit No.

12  7, and how did you think that your evaluation went, that first

13  evaluation that you had with Mr. Barnhouse?

14  A.      I thought it went well.

15  Q.      And was there anything that you were particularly proud

16  of that he had given as a comment or example as to your

17  commitment to your position?

18  A.      Yeah.  I had -- during that year, I had secured a

19  sponsorship with a local hospital, North Kansas City Hospital,

20  which was, I was told, the largest sponsorship that the company

21  had ever had that resulted in $290,000 of bottom-line income to

22  the center.

23  Q.      Now, did you and Mr. Barnhouse have any conversations

24  about your community involvement in those first few days and

25  weeks, months, of him supervising you?

1  A.     No, I don't believe so.

2  Q.     Did he understand that you were involved with the

3  community?

4  A.     Oh, yeah, uh-huh.

5  Q.     Did he --

6  A.     I'm sorry.

7  Q.     That's okay.  Did he express any opposition to your

8  community involvement?

9  A.     No.

10 Q.     Additionally, in looking at this exhibit, Exhibit No.

11 7, if you look under -- on the Section 2, tell us about Zona

12 Rosa's social media presence during this time frame where

13 Mr. Barnhouse was evaluating you.

14 A.     I'm sorry.  I'm not where you're at.  Section where?

15 Q.     We're on Section 2, and it's under -- and I have it

16 highlighted for you if you would like to look at that.

17 A.     Oh, sorry.

18 Q.     That's okay.

19 A.     Yeah.  We had the strongest social media of any of the

20 town centers and had more followers on Facebook and Twitter.

21 And then we had a special program that actually Lynn Meredith

22 started called the Privilege Club, and that was just kind of a

23 frequent customer/shopper club where we would encourage people

24 to sign up and get discounts and specials at our stores and

25 restaurants, and we also had the strongest sign-ups for that.

1 So we were always kind of held as the social media gurus for

2 the company because we had so much social media presence and we

3 were so active in social media.

4 Q.    You just mentioned of all the town centers.  Let's step

5 back a little bit and talk about Olshan Properties and their

6 portfolio.

7          Were you the only -- was Zona Rosa the only town

8 center that they had when they took over in 2010?

9 A.    No.

10 Q.    And how many town centers did they manage?

11 A.    So there was Zona Rosa; there was a town center called

12 The Greene in Dayton, Ohio; there was one called Bayshore in

13 Milwaukee; and there was another one called Peninsula Town

14 Center, which is in Virginia.  So four total.

15 Q.    And were town centers all that were involved in Olshan

16 Properties' portfolio?

17 A.    No.

18 Q.    What did their portfolio include?

19 A.    Oh, they -- very diversified.  They have hotels

20 throughout the country.  They have lots of apartments in

21 Manhattan.  They're based in New York, so in New York there's

22 tons of -- I'd heard a statistic, I don't know if it's still

23 true, that they were the largest apartment owner in New York

24 City.  That was back in the day.  I don't know currently.

25          So lots of apartments, hotels, traditional what we

1   call strip centers in the business, kind of your

2   grocery-anchored, you know, where there's a Target and an Aldi,

3   you know, those type of centers throughout the country.  So

4   very diversified with all kinds of different types of assets.

5   Q.      So when Mr. Barnhouse took over as your supervisor, you

6   had indicated that managers would -- when they would come in

7   and interact with you that sometimes it would be on a frequent

8   basis, sometimes it would be on an infrequent basis.  Tell us

9   about Mr. Barnhouse's leadership style.

10  A.      He was real cut-and-dried.  I mean, there were not --

11  there was not a lot of chitchat with Steve.  I mean, we would

12  have calls, scheduled calls weekly, and they were very short

13  and sweet.  I mean, he was kind of the type of supervisor that

14  didn't want to be bothered unless there was a problem.  And I

15  was able to take care of most of the problems, so he

16  wouldn't -- he would maybe come to the center twice, three

17  times a year.

18          I mean, it didn't happen -- really, all the

19  supervisors over the years, they never really came frequently

20  or with any sort of regularity.  And I always thought that was

21  a testament to my management.  And actually, one of my bosses

22  told me, I don't have to worry about Zona Rosa because I know

23  you're worrying about it.  So I took that to be a positive

24  compliment.

25  Q.      And so during the time that you would have the

1  different supervisors during your tenure, did you ever have any

2  kind of conversations with them about your management style?

3  A.    Yes.

4  Q.    And what would you express to them?

5  A.    You know, I always told them that I felt my job was to

6  protect the asset for the company and that I was an opinionated

7  person, and I had lots of thoughts about things, especially

8  having started the center, been there for so long, lived in the

9  community, and that I'm that person.  I'm -- I liked to express

10 my opinion, and I will always express my opinion.  But I would

11 always tell my supervisors that I also respect authority, and I

12 respect who I work for.  I always respect who I work for.  I

13 respect the position and that ultimately, I'm always going to

14 do what you tell me to do, but I'm going to tell you what I

15 think, too, because I do have an opinion.

16          And I would tell every supervisor that because

17 sometimes some were more receptive to receiving opinions than

18 others.  But I felt like I'm entrusted with a $300 million

19 piece of real estate, so I need to have opinions and I need to

20 have thoughts about how things should go.

21 Q.    So let's talk about your involvement with various trade

22 associations throughout your tenure.  I understand that you

23 were involved with -- you've been involved with the ICSC and

24 going to the programs that they've had throughout the years?

25 A.    Yes.

1   Q.      Tell us about your involvement with that.

2   A.      So I got involved with ICSC back, I think, in the

3   Odessa days.  I don't think I was in ICSC yet at Independence

4   Center, but definitely in Odessa, so I'm a 25-plus-year member

5   of ICSC.

6           And ICSC, just like most typical trade associations,

7   has events, I don't think so much anymore, where you could go

8   and there would be a conference where you would learn, hear

9   speakers talk or you'd learn about the industry, and I went to

10  those over the years with various developers.  And they were

11  also the organization that held the MAXI Awards, so -- and also

12  gave out the designations that I achieved.

13  Q.      Now, you were involved with the trade association.

14  Were you involved with any civic or community organizations

15  during your tenure as general manager at Zona Rosa?

16  A.      Yes, I was.

17  Q.      And so I'd like to talk to you about some of those.

18  And I will direct you back to Exhibit No. 4 --

19  A.      Okay.

20  Q.      -- which has already been received into evidence.  And

21  I will -- I believe if you look on the fifth page of that

22  document, you will see some organizations.  Do you see that?

23  A.      I do.

24  Q.      And so I want to talk to you about towards -- your

25  involvement with these associations towards the end of your

1  tenure with Zona Rosa and how you got involved with these

2  associations.

3   A.     Sure.

4   Q.     Now, in looking at this list, is there one during this

5  time frame that you were particularly involved with?

6   A.     Yes.  That would be the Northland Regional Chamber of

7  Commerce.

8   Q.     And what is the Northland Regional Chamber of Commerce?

9   A.     The Northland Regional Chamber of Commerce is a chamber

10  for the Northland, so they kind of encompass all the Northland

11  of Kansas City, and they help promote the business community

12  and the quality of life for the community.  They're an 800-plus

13  member organization made up of business -- small businesses,

14  large businesses, and they have events, activities, meetings

15  throughout the year.

16   Q.     Why did you think it was important to be involved with

17  the chamber?

18   A.     Actually, Zona had joined the chamber before I started,

19  so -- most businesses join local chambers of commerce as a way

20  to promote their business, get involved in the community, and

21  Zona had been a member, like I said, before I started.  And I

22  became a board member for the organization somewhat into my

23  tenure at Zona Rosa, I think about 2010, 2011.

24   Q.     And walk the jury through your leadership of the

25  chamber and how that worked.

1  A.      So I was a member at the beginning.  Zona Rosa was a

2  member and I was a member, as well, with team members too.  We

3  would attend various events.  They would have luncheons where

4  they would have speakers.  I spoke at several of the events,

5  talking about Zona Rosa and what we had planned and what we

6  were doing.  And then they asked me to join the board of

7  directors, which, like I said, I believe was around 2010, 2011.

8  And with most boards, if any of you are familiar with boards,

9  you kind of start either just kind of as a board member, you

10  get involved in a committee.

11          So I was involved in the business development

12  committee.  And I was involved that committee for a year or

13  two, and then I was asked to join the executive board; and

14  usually the executive board is a pathway to -- is a leadership

15  pathway with the organization.  You start typically as a member

16  of the executive board.  Then you go up to the, what they call

17  the officer positions, which, for the chamber, would be like a

18  treasurer position, a vice chair, and then a chair.

19          So, you know, there was kind of multiple levels of

20  getting to that chairmanship of the board organization.

21  Q.      And so in the 2017/2018 time frame, what were your

22  positions within the chamber?

23  A.      So in 2017 I was chair-elect.  I had been going through

24  that process on the board, and I was chair-elect of this

25  800-member organization, and I was ready to assume the

1  chairmanship of the organization, of the board in 2018.

2  Q.    And with any board that you served on, did you ever

3  have a conversation with the executive directors about

4  expectations?

5  A.    The executive directors of the board?

6  Q.    Yes.

7  A.    Yes.  Yes.

8  Q.    What did you express to them?

9  A.    I was kind of apologizing because I missed so many

10  meetings all the time.  I always told them that Zona Rosa was

11  always my priority.  As I've said before, shopping center

12  management, and probably one of the things I loved about it the

13  most is no day is the same.  And we always say we put out the

14  biggest fires first.  It's just, you never know what's going to

15  come walking in your door when you're trying to walk out, and

16  my husband can attest to that too because I never got home on

17  time.

18        But I would tell the executive directors that I

19  would do my darnedest to get to meetings, but I wasn't always

20  going to make it if something happened.  And I had to always,

21  you know, maybe apologize because I didn't make meetings

22  because I could have the best intentions of going to a meeting

23  and be heading out the door to go to a meeting, and then

24  something would come up and I would have to stay.

25        So they always knew that Zona Rosa was my priority,

1   and if there was something -- an issue or a problem or
2   something going on at the center, then I was going to have to
3   miss a meeting.
4    Q.      And so when did most of these board meetings tend to
5   occur?
6    A.      Well, the chamber in particular holds all of their
7   board meetings at 7:30 in the morning, 7:30 to 8:30, they're
8   one-hour meetings.  A lot of the boards -- it's just various
9   times.  Most of them are either early morning or over the lunch
10  hour, they're noon meetings.  Some are during the day, but for
11  the most part, they're either early morning or during lunch
12  period.
13   Q.      And what kind of programs did you participate with
14  through the chamber during the years in your involvement with
15  them and your board involvement?
16   A.      Sure.  So this chamber was very active on many levels,
17  and one of the programs that they offered was something called
18  Leadership Northland, which was an eight-month program that
19  would kind of immerse the folks who were a part of this program
20  into north -- into the Northland.  You would do everything from
21  meeting with the school superintendents, to meeting with the
22  hospital CEOs, to meeting with the people at MoDOT, to meeting
23  with -- they actually had a day where they came down to City
24  Hall and met with the elected officials, and that actually
25  culminated in a one-day trip down to Jefferson City to meet

1  with elected officials.  The idea was to grow leadership and

2  leaders for the community, and that was a big program that the

3  chamber offered.

4  Q.      Did you participate in that program?

5  A.      I did.

6  Q.      And did you have your staff members participate in that

7  program?

8  A.      I did.

9  Q.      And what staff members participated in that leadership

10 program with the chamber throughout your tenure?

11 A.      Pretty much everybody on the leadership team and the

12 management team.  I had -- we would only send one person a year

13 because it was a class -- the leadership classes were about 30

14 people from various business organizations in the community, so

15 Zona Rosa would have one representative in that group of 30.

16 And I actually wasn't even the first one that graduated from

17 the program.  Some members of my staff did prior to me taking

18 it.

19          So I had property accountants take it.  I had our

20 marketing assistant take it.  I had my administrative assistant

21 take it.  I had our facilities folks take it.  I mean, it was

22 just -- and actually, our security director took it.  It was

23 just various folks throughout the course of my tenure there,

24 whoever was, you know, kind of ready for it who I felt would

25 benefit from that partnership and that leadership and who would

1  gain something from the program.

2  Q.      Did Miss Land participate in that program?

3  A.      She did not.

4  Q.      And did Mr. Sharbono participate with that program?

5  A.      He did.

6  Q.      And what other events did -- particularly as you were

7  coming in to be the chair of the chamber, was there any other

8  events that you were participating in that would have been one

9  of the after-hours activities that you were involved with?

10  A.      So, yeah, the chamber did host after hours, but then

11  there was an annual banquet that we were -- that they were

12  preparing for that's always kind of the ceremonial changing of

13  the guard with the chair and kind of the annual meeting for the

14  organization.

15  Q.      When does that chamber, the Northland banquet happen to

16  change, to make you the chair of the organization?

17  A.      It happens in mid to late January every year.

18  Q.      And so that would have been in January of 2018?

19  A.      That's correct.

20  Q.      And there has been some discussion of swing dancing.

21  Tell us about what that banquet was and what your role was in

22  that banquet.

23  A.      Sure.  So Sheila Tracy, who is the long-term president

24  of the chamber, staff member, highest staff member of the

25  chamber, came to me about mid-year of '17 and said, Rosemary, I

1  have a great idea for next year for the banquet when you take

2  over.  And I said, what's that?  She said she wanted to reprise

3  an event that had taken place actually ten years prior.  So

4  this would have been the ten-year anniversary of them doing a

5  Dancing With the Stars event.

6          And I just started laughing hysterically and saying,

7  no way, I'm not doing it.  And she said, oh, it would be great

8  fun, and people loved it when we did it then, and it makes

9  sense that it's ten years later, and it would just be a great

10 way to kind of usher you in as chair.  You would be one of the

11 dancers, along with other members of the organization.  And she

12 just thought it was a fabulous idea, but I said I wasn't going

13 to do it because I was -- I'm not a dancer, and I didn't think

14 I could do it, and I wasn't interested in doing it.

15 Q.     What changed your mind?

16 A.      She persisted.  And then she came to me a couple months

17 after that, and she was still kind of bugging me about it and

18 telling me how much fun it would be and how, you know, we

19 should do it.  And she said, what if I could tell you I could

20 get Mayor Sly James to be your partner?  And I said, huh, that

21 could be fun.  Because I knew Mayor James, he had been a

22 partner with us at events in the community, and I knew he had a

23 fun personality, so I thought even if we were horrible dancers,

24 at least maybe we could have fun with it.

25          So I said, if you can get Mayor James, then I'm

1  down.  So that's what I said.

2   Q.     Did you dance with Mayor James at the chamber's

3  banquet?

4   A.     I did not.

5   Q.     What happened that changed that?

6   A.     So we were getting closer -- so this was, like, now

7  probably November'ish, December'ish of 2017.  So the banquet is

8  happening in January, and Sheila and her team were working on

9  the dancing partners.  And the idea was there would be a member

10 of the board paired with an elected official.  So there were

11 mayors of various towns, city council folks.

12         I was to dance with Mayor James and, unfortunately,

13 he just decided he couldn't do it.  So Sheila came to me and

14 said, well, he has a conflict.  He had written a book, I

15 believe, and he had -- was going on a book tour or something.

16 He did have a legitimate reason why he couldn't do it.  So he

17 was not able to participate.

18  Q.     And who was the suggestion as a replacement for Mayor

19 James?

20  A.     So then Sheila told me she was going to get Troy

21 Schulte, who was the city manager for Kansas City, Missouri.

22 And I knew Troy too.  And I thought, okay, well, that could be

23 fun too.  Troy had -- I had worked with him on various things

24 with Zona Rosa.  And so I said, okay, that sounds great, let's

25 get Troy.

1  Q.     Did that work?

2  A.     It didn't, no.  Troy decided he was too busy, as well.

3  Q.     And so in the days and weeks leading up to this banquet

4  that you're supposed to be dancing in, what did you do?

5  A.     Well, I was panicking because all of the other teams

6  had assembled, they had started taking -- the chamber actually

7  hired a dance studio to coach the teams on how to dance, so I

8  was panicking.  I actually started dance lessons by myself

9  while Sheila was trying to frantically find somebody who would

10  dance with me.

11  Q.     And so what was the solution to this issue?

12  A.     Well, Sheila and one of her gals at the chamber called

13  and said -- they knew Todd because Todd had gone through the

14  leadership program and Todd had been a part of the chamber.

15  And they said, what about Todd?  And I said, well, I don't

16  know.  Maybe we can ask him.

17  Q.     And is this Todd Sharbono?

18  A.     It is, yes.

19  Q.     And when did Todd agree to participate in this event

20  with you?

21  A.     It was just a couple of weeks before the event.

22  Q.     And did you guys ever take the -- any kind of dance

23  lessons while you were working?

24  A.     No.  We did not.

25  Q.     How did that work?

 1  A.      So we would leave work and go to a dance studio that

 2  was just not too far away from Zona Rosa.  And there were

 3  several nights leading up to that event where we were working

 4  from, you know, 7, 8 o'clock until one night we even stayed

 5  there until midnight because Todd and I, neither one of us are

 6  dancers, and it was -- you know, it was a -- I was willing to

 7  do it for the chamber.  I was not looking forward to it,

 8  really, because I just thought we were going to kind of make

 9  fools out of ourselves.

10          But we tried to approach it with a tongue-in-cheek

11  attitude that, you know, let's just go and have fun, and we're

12  representing Zona Rosa and we're representing -- we're doing

13  something good for the chamber.  So we would do -- our practice

14  would happen after work in the evening hours.

15  Q.      And was there anyplace at Zona Rosa in these

16  after-hours time periods where you would practice?

17  A.      Not in the after hours.  One time, I think once we

18  practiced in a room in Zona Rosa that actually some of the

19  other couples also used.  Sheila knew we had this room.  It was

20  a rentable community room where people would have parties and

21  events, but it was a big open space.  And Sheila had asked,

22  because her -- she was actually dancing with a director of

23  aviation from KCI, and it was kind of a central point for them

24  to meet at Zona Rosa and practice dancing in that room.

25          So Sheila had met him and danced there, and Todd and

1   I once or twice over our lunch hour went into that room and

2   practiced.  And this was, like, the week of the event when we

3   were really getting to where we were needing to have the

4   routine down to be able to be at the banquet the following

5   weekend.

6   Q.      How did the event go?

7   A.      Well, we came in sixth.

8   Q.      Out of?

9   A.      Six.  It was -- you know, it was all for fun, it really

10  was.  I mean, people didn't -- you know, people loved the

11  event, and we had so many people tell us, tell everybody how

12  much they loved it.  Sheila loved it.  Everybody thought it was

13  great.  It was more than -- I think a typical banquet you go

14  and you have dinner and you listen to some speakers and you

15  give some awards, but they said this really made the event fun.

16  And the chamber raised a ton of money because they actually

17  sold more tables and more sponsorships for the event than they

18  typically would because people wanted to see this Dancing With

19  the Stars event.

20  Q.      Did you do any other dancing with Mr. Sharbono other

21  than this event during your tenure at Zona Rosa?

22  A.      I did not.

23  Q.      We're talking about your civic and community

24  involvement, and I understand that you were a past board

25  president of Miles of Smiles?

1   A.      That's correct.

2   Q.      Did you believe that your board work on this board was

3   related to your job at Zona Rosa?

4   A.      Yes.  I met them through my job at Zona Rosa.

5   Q.      How so?

6   A.      So the Miles of Smiles group had applied to be a

7   recipient of the Change for Charity program, and that's how I

8   first came to know them.  And they do work for children in the

9   Northland.  They provide free dental care for kids who don't

10  have insurance or if they're underinsured in the Northland,

11  that's what they do.  So they applied for funds, and they were

12  actually a recipient for our Change for Charity funds.

13  Q.      And were you the only Zona Rosa employee or any

14  employee of Olshan that was involved with the Miles of Smiles

15  program?

16  A.      Yes, I was.

17  Q.      And did any other staff members at Zona Rosa

18  participate with Miles of Smiles?

19  A.      On the board?

20  Q.      No, just with the program.

21  A.      Yes.  I mean, there had been an occasion where -- and

22  part of the partnership that we developed with Miles of Smiles

23  was a fashion show that was called Brush Up on Fashion.  And we

24  developed that and donated some of the funding for that, and

25  there were employees at Zona Rosa that participated in that.

1  Q.      So there's been discussion about Mr. Sharbono driving

2  an RV for Miles of Smiles.  Tell us your role in that.

3  A.      I didn't have any role in that.

4  Q.      And as far as your involvement, or directing your

5  employees to be involved with any boards, did you ever do that?

6  A.      Never.

7  Q.      Did you enjoy this part of your job being involved with

8  the boards?

9  A.      I did.  I thought it was a good way to ultimately

10 promote the center and enrich our team.  There were lots of

11 opportunities for our team members to get involved.  As far as,

12 like, chamber events or if they were a part of this leadership

13 program, they got out and met people, they got to know elected

14 officials, and I thought that was good for them personally, as

15 well as for Zona Rosa.

16 Q.      I understand that Zona Rosa was built in phases, or two

17 phases, to be exact.  Describe for the jury how that worked.

18 A.      So Phase 1 of Zona Rosa opened in 2004, and it was kind

19 of a -- there's a creek that runs through Zona, if you know

20 that, and so everything south of the creek is what we termed

21 Phase 1.  It's about 500,000 square feet of space, it had 24

22 apartments, about 110,000 square feet of office space.

23         Then when Zona Rosa Phase 1 opened, and actually

24 when I started, there was already talks of the Phase 2 that was

25 going to open, so that was thought of even as Zona Rosa Phase 1

1  was opening.  So we always knew there was going to be an

2  additional phase of Zona built on the north side that would

3  encompass about another 500,000 square feet of space.

4   Q.     So when was Zona Rosa, the second phase started?  When

5  did that construction start?

6   A.     Construction started late '07, early '08.  I don't

7  remember for sure, but the phase of the center opened in

8  November of '08.

9   Q.     And were there any problems or challenges with this

10 process?

11  A.     Yeah.  It was -- if you recall back at that time, that

12 was kind of when the bottom fell out of the economy, and we

13 often said that maybe if construction had been delayed three or

14 four months, that part of the center would have never been

15 built.

16        So as it was under construction -- and typically in

17 this business, you lease up things before you build it too.

18 They had had a lot of leases that actually pulled out.  So

19 people that had committed to going to the center, because of

20 the economy and the way things were going, decided to cancel

21 their leases for various reasons.

22        So it was a tough time because, here we are building

23 this great addition to the center, but yet there wasn't a whole

24 lot of retail to fill the spaces.

25  Q.     And was there any bond that was given to Zona Rosa

1  related to the second phase?

2  A.      Yes.  There was a bond with Platte County.

3  Q.      What was your understanding of that bond?

4  A.      It had to do with the parking garages.  So they were

5  backed by county bonds.

6  Q.      And what was your understanding as to how that would be

7  paid?

8  A.      It would pay, be paid with the sales tax generated by

9  the one -- sorry, there was a 1 cent sales tax that would go to

10 pay back those bonds.

11 Q.      And so would it be from the retail, restaurants, all of

12 that from the center would go back?

13 A.      Correct.

14 Q.      And that issue was in place from the time that the

15 second phase -- I think you said in 2009?

16 A.      Eight.

17 Q.      2008?

18 A.      Yeah.  As far as I know, yes.

19 Q.      I'd like to talk to you now about one of the programs

20 that Zona Rosa had, and it would be the Change for Charity

21 program.

22 A.      Uh-huh.

23 Q.      Are you familiar with that?

24 A.      I am.

25 Q.      Could you explain to the jury what the Change for

1  Charity program was?

2   A.    So Change for Charity was a program that Steiner &

3  Associates actually started at their center, Easton Town

4  Center, and then Mr. Steiner had this program at all of his

5  centers.

6          And what it was effectually was parking meters were

7  placed throughout the interior of the center, and it was

8  short-term parking for customers.  So there was a one-hour time

9  limit on the meters, and customers would feed the meters with

10 coins and would also receive little $5 parking tickets if they

11 didn't pay the meter, if the meter expired, and all of that

12 money would go to local charities in the communities where his

13 centers were located.

14  Q.    And when you started at Zona Rosa in 2004, was that

15 program already established?

16  A.    It was.  It had been established at the groundbreaking

17 of the center, which had taken place a year prior.  And

18 Mr. Steiner had started it with his own money; and the way I

19 heard it told was that at the groundbreaking, they gave out

20 scholarships to seniors at the local high school, so that's

21 what -- the founding of the program was through the scholarship

22 programs.

23  Q.    And what did the parking meters indicate to the public

24 that the money was going towards?

25  A.    To charitable organizations or for the community --

1  community organizations.

2  Q.     And did that change during your tenure?

3  A.     The program shifted and was called different things

4  throughout my tenure, yes.

5  Q.     But every time the patron would put the quarters in for

6  the short-term parking meters, did they always understand and

7  did it always read that it was going to charitable causes in

8  the community?

9  A.     Yes.

10         MR. LILLARD:  Objection, Your Honor.  Asking a

11  question of the witness what other people would perceive.

12         THE COURT:  Overruled.

13  BY MS. DICKSON:

14  Q.     Now, you had indicated this was short-term parking.

15  Was there other parking, as well?

16  A.     Oh, yes, we only had about, I think, less than 300

17  metered spaces, so -- again, just on the interior of the town

18  center.  But all of the surface lots, and we had -- you know,

19  at the end, we had three parking garages with the second phase.

20  All of that parking was 100 percent free.  But we just told the

21  customers and the community that if you chose to use the

22  meters, it was paid, but all the money would go to local

23  organizations.

24  Q.     And did you ever receive any kind of displeasure with

25  that when patrons would come in?

A.      Yeah, sometimes.  I mean, it was the kind of thing that
every so often we would get people coming into the office, or
security would have to deal with an angry patron that was
waving a ticket, and, you know, they were upset because they
had just had, you know, a nice dinner at Hereford House and
spent $200, and now we've got a $5 ticket.

        And we would always, and we would train our team to
explain to people what the program was about and always kind of
talk them off the ledge because they were -- we had more than
one person that was screaming that they couldn't have another
parking ticket on their record.  And we had to explain this was
just Zona Rosa police that were giving you a ticket, and we
would explain the program to them.  And nine times out of ten,
they would give us a $20 bill or $100 -- they would give us
more money because they were appreciative that it was going to
something other than just to pay the shopping center developer.

Q.      And so how did this Change for Charity work?  How was
the income from those parking meters collected?

A.      Security handled the collection.  There was actual coin
collection.  So the meters were throughout the town center.  We
had meters on public streets, and we had meters on private
streets.

        So security was charged with going -- they had a
collection cart.  They would have to go around and actually
take the money out of the meter, and there was a system where

1  they didn't have to touch the coins.  They actually inserted

2  the canister, and they would dump the canister into this

3  collection cart.  And then they would come and bring the

4  collection cart to a designated location and then dump the

5  meter money into two different buckets.

6  Q.      You mentioned public versus private.  What do you mean

7  that?

8  A.      There's two public streets that run through Zona Rosa,

9  KCMO public streets, and we had to account for the coins in

10  those meters separately than the coins on the private street.

11  Q.      And what was your understanding as to why that was the

12  case?

13  A.      My understanding was that there was an agreement that

14  had been drafted -- again, before I started back before the

15  center opened -- where the city, since the meters were on city

16  streets, that the city wanted the separation of the coins,

17  separation of the money because they, not -- and I don't think

18  it was ever intended that they would want to take the money,

19  but from what I understood, that they would maybe potentially

20  want to designate their own charitable organizations that would

21  receive their money, the money from the city streets.

22  Q.      And during your tenure, did that ever happen?

23  A.      No.

24  Q.      Was there ever a concern that the development agreement

25  wasn't executed between Zona Rosa and KCMO?

1   A.      Yeah, I raised the issue a couple of times over the

2   years because it was kind of a challenge for the staff.  We had

3   to -- the way we had to collect the money, the way we had to

4   account for it separately, the way we had to book it to

5   different accounts.  And since this had been an unexecuted

6   agreement that dated back to before I started, I had raised the

7   issue a couple of different times about do we still have to

8   be -- do we still think we had we have to account for this

9   money separately?  Is it necessary to have to dump these into

10  separate buckets?  And I was always told yes, that we always

11  had to segregate the money because at whatever point the city

12  wanted to either audit the account or see the account, we

13  wanted separation of the city coins from the private coins.

14  Q.      And so during your tenure, how much income would these

15  parking meters and tickets generate?

16  A.      Quite a lot.

17  Q.      And I would ask you to look at Exhibit No. 65, please.

18  A.      65, you said?

19  Q.      Yes.

20  A.      Okay.  I'm there.

21  Q.      And Exhibit No. 65 is a local article or a local review

22  that was done by a news station related to the Change for

23  Charity accounts, correct?

24  A.      Yes.

25          MS. DICKSON:  I would move for Exhibit 65 to be

1  admitted into evidence.

2           MR. LILLARD:  Objection, Your Honor.  It's a hearsay

3  objection.  The person who wrote the article and the people

4  mentioned in it are not testifying today.

5           THE COURT:  Why is it not hearsay?

6           MS. DICKSON:  Ms. Salerno was interviewed in this

7  process, and there's information directly from her in this

8  document.

9           THE COURT:  Why don't you ask her about the

10  statement that she made in this, and we can take up whether or

11  not the document is admissible at the close of the evidence

12  today.

13           MS. DICKSON:  Yes.  Thank you.

14  BY MS. DICKSON:

15  Q.     Ms. Salerno, you were interviewed related to the

16  parking meters and the money that was collected going to

17  charity.  Correct?

18  A.     Correct.

19  Q.     And when you were interviewed, what did you tell --

20  what did you talk about with the news station related to where

21  the money from the Change for Charity went to?

22  A.     That it went to the community, to local charities.

23  Q.     And did you also indicate how much money the Change for

24  Charity program has generated, at least at the time of this

25  article?

1    A.      I need to read it.

2    Q.      And I'm looking at page 2.

3    A.      Yeah, I think at that point it was over $2 million.

4    Q.      And does this all come in through quarters?

5    A.      Yeah, quarters.  It's a lot of quarters, yeah; and also

6  the ticket money, which was $5.  So yeah.

7    Q.      Now, during the time that you were -- and as general

8  manager, did you administer or oversee this program of Change

9  for Charity?

10    A.      Yes.

11    Q.      And I understand this would have been at other town

12  centers that Olshan managed, as well, correct?

13    A.      Correct.

14    Q.      And was the program similar throughout all of the town

15  centers?

16    A.      Yes.

17    Q.      And was -- were you ever given any indication during

18  this time frame of your tenure with Zona Rosa prior to January

19  of 2018 that this money would go towards operating expenses not

20  related to the parking meters?

21    A.      No.

22    Q.      So during this time frame, were there expenses that

23  would come out of the Change for Charity account?

24    A.      Oh, yes, uh-huh.

25    Q.      What kind of expenses would those be?

1   A.      Well, expenses to run the program.  So everything

2   from -- you know, we had a big industrial coin counter because

3   our staff had to actually feed the coins into the counter, and

4   it put it into bags.  And those bags.  Everything related to

5   the operation of getting the coins assembled and counted and

6   sent to the bank.  We actually had to hire an armored-car

7   service.  We tried to take it to the bank on a cart in the

8   early days, and the cart fell apart because we didn't realize

9   how heavy large bags of coins were.  So we had to hire an

10  armored-car service to come weekly to pick up the coins that we

11  had bagged.

12              So expenses like that.  Expenses like with the

13  ticket machines, they took paper.  If the ticket machines

14  needed repairs.  Security guards' time to collect it would be

15  used to -- against the account.  So just various things like

16  that over the years.

17  Q.      And was there -- did any of the parking meters have

18  credit cards?

19  A.      They did.  Not at first, but somewhere along the way,

20  we installed, I think about 60 credit-card meters at the

21  busiest portion of the shopping center because we were getting

22  feedback from customers that not everybody carries coins

23  anymore, and certainly today they don't, but even back then,

24  they didn't.  So we did an experiment and put in about 60

25  credit-card-reader machines.

1 Q.      And were there expenses associated with that that were

2 billed to the account?

3 A.      Yes.  When we purchased the meters, those fees came

4 out, as well as there was monthly fees for the credit-card

5 processing of all of those meters.  The meters took batteries,

6 so we had to expense the batteries.  So anything related to the

7 meter itself or the processing of money to the meter.

8 Q.      And that was consistent throughout your tenure in

9 overseeing the Change for Charity program?

10 A.      Yes.

11 Q.      Were there times when the meters and the tickets

12 produced more income for the program?

13 A.      Yes.

14 Q.      And tell us about that.

15 A.      Well, it was just like anything, it was seasonal

16 fluctuation.  So obviously, holiday time when shopping centers

17 are busiest, November/December, income goes up for the meters

18 because there's more guests at the center, more traffic, more

19 turnover of the meters.  So November/December were typically

20 the busier months.  But for a center like Zona Rosa, summertime

21 was also busy because we would have concerts and activities

22 throughout the summer, so it became a gathering spot for the

23 community.  So really July -- June, July, August were busy

24 months for us, as were the end of the year.

25              So those times of the year, typically revenue was

1    up, and then usually January and February, again, as most

2    traditional retail centers, especially in Kansas City,

3    Missouri, are just not as busy, so revenue would be down in

4    those types of months.

5    Q.      You've walked us through the steps of the Change for

6    Charity program and how it had income and expenses.  What was

7    the purpose of this program?

8    A.      Well, it was for the betterment of the community, to

9    promote the welfare for the community and to work with these

10   organizations and to not only give them funding, but to also

11   give them awareness, a partnership with us.

12              So when we would award money or when organizations

13   would apply for funds, we would also promote them through our

14   social media, through newsletters, through our website.  And we

15   heard from so many different organizations over the years that

16   they appreciated that promotion almost as much as they

17   appreciated the money because Zona Rosa was a well-known entity

18   in the community, and getting their message out to our

19   customers was valuable for them, but obviously, the money was

20   important, as well.

21   Q.      And so how was it determined the organizations that

22   received money from the Change for Charity program?

23   A.      Well, that changed over the years.

24   Q.      And so during the beginning of your tenure, what was

25   the process?

A.      Organizations would just send in an application.  They could download an application on our website, fill it out, and we would award money to organizations every month.  We would select 12 charities annually, and every month, they would get a portion of the meter proceeds and a portion of the ticket proceeds, and then it would change the next month.

Q.      And how did that change throughout your tenure?

A.      So then -- and I don't really remember the timing, but a few years in, we changed it to every other month because it was kind of a lot of bookkeeping to keep up with on a monthly basis, so we thought -- and we thought it would be a more meaningful donation on a two-month basis, as opposed to just a month basis.

        So we changed it to six charities a year that would receive the Change for Charity meter money, but then there were also partnerships that were developed with different organizations that would hold events at Zona, and we would help them with that event through the Change for Charity money.

Q.      And is that the way that it stayed throughout your tenure?

A.      No, it changed.

Q.      And when is the next change to that program?

A.      It probably happened sometime in 2013, '14'ish.

Q.      And what was your understanding of the, how the Change for Charity program would proceed after that date?

1  A.      We were told that there would no longer be monthly or

2  bimonthly, whatever, donations to charities, that we had to --

3  it wasn't going to just be checks out to organizations.  There

4  had to be some sort of tie or partnership with Zona Rosa for

5  the organization to receive any sort of funds.

6  Q.      And so what did that look like with the involvement of

7  these organizations?

8  A.      Can you clarify the question?

9  Q.      Sure.  So did you -- how did you partner with

10 organizations to help them receive Change for Charity funds?

11 A.      Sure.  So we would have events at the center.  The

12 direction was, you know, they needed to have a physical

13 presence at the center or somehow participate in an event at

14 the center.  So there was everything from 5K charitable

15 walk/runs; there was an annual event called Stand Up for

16 Synergy that we held; there was, you know, a Taste of Zona Rosa

17 which benefitted a local symphony.  So it became the way the

18 center -- it became our activities for the center were these

19 partnerships with these various charities.

20 Q.      And did the expenses that would come out of the Change

21 for Charity account change with that direction?

22 A.      It did.

23 Q.      How so?

24 A.      So we had a budget for Change for Charity.  That was

25 somewhat challenging because we never knew 100 percent what the

1  income was.  But we would try to estimate income, and then we

2  would have expenses associated with it, but all of those

3  expenses were tied to programs at the center.

4  Q.    And is that the way that the Change for Charity program

5  worked throughout the rest of your tenure?

6  A.    Yes.

7  Q.    Why was this program important for Zona Rosa?

8  A.    Well, it was a way for us -- you know, when we started,

9  when we opened the center, and even before opening, like I said

10  with the scholarships, it was a way to present Zona to the

11  community as a concerned partner, and it showed us as a partner

12  with the community.  Because a lot of these organizations were

13  small.  We helped small, we helped large, it was all over the

14  board, but we were able to give some really meaningful

15  donations to organizations.

16          I think one story that has always stuck with me, one

17  small organization came to me after our donation and said that

18  they were able to retire the debt on their building because of

19  the donation from Zona Rosa.  So this was real money going to

20  organizations that were doing good work in the community.

21  Q.    You had indicated some of the organizations and that

22  there had been scholarships.  Were there any kind of signature

23  programs associated with this?

24  A.    There were.

25  Q.    What was the signature program?

1   A.      Well, the signature program was a program called Stand
2   Up For Synergy.

3   Q.      What was that?

4   A.      So this was going back to Mr. Steiner.  About a year
5   after we opened, he explained to our team that all of the
6   centers had a signature charitable event, so he tasked us with
7   finding a charity who could partner with us, which would be --
8   that would partner with us on an ongoing basis for an annual
9   event that would kind of be the, again, just the signature
10  event, signature charitable event for Zona Rosa.  And all of
11  the other centers had similar events, so he had asked us to
12  come up with one for Zona Rosa.

13  Q.      And you did that?

14  A.      We did.

15  Q.      And how long did that program continue?

16  A.      It continued until probably -- I get sometimes confused
17  on the years.  Probably '14/'15'ish.

18  Q.      And why was that program discontinued?

19  A.      We were told to discontinue it because Olshan didn't
20  want to spend the money on it.

21  Q.      I'd like to talk to you about the staff that you had
22  with -- at Zona Rosa when you were the general manager.  You
23  had indicated that the management, at least when you started
24  with Mr. Steiner, with Steiner & Associates, there was a
25  director of operations and yourself, correct?

1  A.      Correct.

2  Q.      And I think a director of security, correct?

3  A.      Correct.

4  Q.      And that changed at some point on the security

5  position, correct?

6  A.      It did.

7  Q.      What happened there?

8  A.      So when we opened, we always had an in-house director

9  of security and also an in-house assistant director of

10  security, but then the security staff was a third-party

11  contractor, meaning it was a separate company that provided the

12  day-to-day officers that were kind of under the director of

13  security and the assistant director of security.  And somewhere

14  along the line, those two in-house positions actually got

15  pushed to the third party, so they ceased being Steiner

16  employees or Olshan employees.  I can't -- the timing, I think

17  it was during the Olshan time.  They became employees of the

18  third party, they were no longer in-house employees.

19  Q.      And there's also -- were there any other third-party

20  contractors that you dealt with as part of your staff?

21  A.      Yes.

22  Q.      And who was that?

23  A.      Probably the largest was our housekeeping staff was a

24  third-party contractor.

25  Q.      And what role did you play with overseeing the

1  housekeeping?

2  A.      I had to manage the contract.  I helped select the

3  vendor at the opening, and I oversaw -- the third-party

4  contractor had a manager, a housekeeping supervisor that was

5  placed at the center, so I worked directly with him, and then

6  he oversaw his staff.

7  Q.      And who was that gentleman?

8  A.      Mike Willard.

9  Q.      And how long had Mr. Willard been part of Zona Rosa?

10  A.      Mike Willard had the longest tenure besides me.  We

11  both started -- I started two months before the center opened,

12  and he started about two weeks before the center opened.  So

13  besides me, he was the longest-tenured employee at Zona Rosa --

14  or the third party at Zona Rosa, I should say.

15  Q.      Even though he may have been a third party, did you

16  treat him as part of the group?

17  A.      Yeah, of course.  I tried to always -- I tried to

18  always be the type of manager that wanted people -- wanted my

19  team to feel included, and I wanted them to know that their

20  voices were heard and that they were part of a team.  And so

21  Mike was always included on staff meetings, he was always

22  included on decisions.  If there was something that we were

23  kind of coming together as a team, Mike was always a part of

24  that group with us.

25  Q.      And you also mentioned that the security eventually

1  went to a third party, even the director position?

2  A.      Uh-huh.

3  Q.      Did you still have involvement in oversight for the

4  security director?

5  A.      Oh, yes.

6  Q.      And tell us how you were involved with that.

7  A.      I would interview -- if they had a personnel change,

8  not so much officer change, but director, assistant director, I

9  would be involved in those interviews and would be able to

10  offer my choice of who we would like to have at the property.

11  Q.      And I understand that Zona Rosa also has a residential

12  component.  Was there a manager associated with that?

13  A.      Not at the beginning, but along the way, we did get

14  one.

15  Q.      And when did that occur?

16  A.      So I think I mentioned in 2004 when we opened the

17  center, there were 24 apartments, and we managed those

18  ourselves from our office.  So I essentially and a couple of my

19  team members, my administrative assistant and my marketing

20  assistant, we would show apartments.  We were kind of the

21  leasing team.  We would go let people in to see the apartments,

22  we would write up the leases, and we kind of handled it all

23  in-house.  Our facilities team would handle the cleaning and

24  all of the, kind of the turnover.  If somebody moved out, they

25  would go in and do the make-readies, as we called them, for the

1  new tenants.  So it was all handled because it was just 24

2  units.

3          But then in '08 when we opened the second phase, we

4  opened an additional 49 or so apartments.  And at that point,

5  we decided it was going to be just a little too much for us to

6  take on as a team, so I did get approved in our budget to add a

7  residential manager to our payroll.  So it would have been end

8  of '08.

9  Q.     And during that time period, how many residential

10 managers did you have during your tenure?

11 A.     I don't even know if I can count.  There was probably

12 at least six, seven, eight.  I mean, there were quite a few.

13 There's a lot of turnover -- I have learned there's a lot of

14 turnover in that field, just not at Zona Rosa, but kind of in

15 that apartment management field in general.

16 Q.     And who was your last residential manager during your

17 tenure at Zona Rosa?

18 A.     Paula Land.

19 Q.     And when did she begin?

20 A.     She began probably, I would say, 2016, I'm guessing.

21 Q.     I understand that there's also a facilities manager?

22 A.     Yes.

23 Q.     And how did the facilities manager come to be?

24 A.     The facilities manager at Zona Rosa?

25 Q.     Correct.

1  A.      So we had previously had a director of operations, and

2  that position was eliminated in, I think it was late 2014.

3  There were some -- that was kind of the start of budget cuts,

4  and that was a position that was eliminated, along with our

5  property director of accounting, whatever that position was

6  called.  The in-house staff accountant that we had on the

7  property, that position was eliminated, as well as some others.

8            So the director of operations position was

9  eliminated, and I was without that position, which I found to

10 be very detrimental in many ways because I leaned on that

11 position to manage the facility.  I'm not an expert at

12 diagnosing things like heating and cooling units and roof

13 leaks, and I relied on my director of operations to do that.

14 So I was very concerned when they eliminated that position, and

15 I expressed that.

16 Q.      And so what was the position that was created in order

17 to help you with those type of problems?

18 A.      It was called a facilities manager.

19 Q.      And during your tenure with Zona Rosa, who was the

20 facilities manager?

21 A.      Todd Sharbono.

22 Q.      And when did he start?

23 A.      He started, I think, sometime in early '15.

24 Q.      How did you two meet?

25 A.      Todd I actually met several years prior because he was

1  a director of facilities, or facilities director, I don't know

2  his exact title, for the Kansas City Museum.  And we had

3  developed a partnership with them for our Fairy Princess and

4  our igloo, which were two holiday events that we had had.

5  Q.    Zona Rosa had had?

6  A.    Yes, sorry.  Uh-huh.

7  Q.    How did he -- did he have any employees under him?

8  A.    He did.

9  Q.    And what type of employees was under -- what type of

10  employees was under the facilities manager?

11  A.    So there was a gentleman by the name of David

12  McLaughlin, affectionately known as Spud.  So Spud was right

13  under Todd, and Spud had actually been there since 2005.  He

14  started a year after our center opened, and he was kind of in a

15  senior role.  I think we called him senior facilities, just to

16  honor his tenure.  He had been there for so long, so we gave

17  him a senior title some point along the way.

18        Then there were -- it fluctuated with the other

19  positions.  There were usually two other full-time facilities

20  to where our full team would be four people, but that changed

21  to sometimes we only had three, depending on season and budget

22  and all of that.  But always three and sometimes four.  Total,

23  including the facilities manager is what I'm saying.

24  Q.    And were they referred to as the maintenance crew?

25  A.    Yes, uh-huh.

1   Q.     And then there would have been office staff, as well,

2 that you dealt with on a daily basis in your role as general

3 manager, correct?

4   A.     Correct.

5   Q.     What were the roles of the office staff at Zona Rosa?

6   A.     At what point?

7   Q.     Let's talk about the last couple of years of your

8 tenure.

9   A.     So there was an administrative assistant and a

10 marketing assistant, and at the end, we just had a few

11 part-time guest services associates, and that was --

12   Q.     Was --

13   A.     I'm sorry.

14   Q.     Was that number lower than when your employment began?

15   A.     Oh, yes.

16   Q.     And was that related to budget cuts?

17   A.     Oh, yes.

18   Q.     Was that difficult for you?

19   A.     Yes, it was.

20   Q.     Why?

21   A.     Well, it was a constant refrain of trying to do more

22 with less. I mean, we needed staff to get things done, and we,

23 you know, would eliminate positions. And the work didn't stop,

24 we just had to figure out a way to get it done with less

25 people. So we continued to do that when we would have

1  eliminations, and we did to the best of our ability.

2  Q.    Did Zona Rosa struggle financially during your tenure?

3  A.    It did.

4  Q.    Let's start with the budget.  How did that change

5  throughout your tenure with Zona Rosa as their general manager?

6  A.    Well, we got less and less money to spend, so...

7  Q.    What did you -- what were ways that you tried to deal

8  with that issue?

9  A.    We always tried to be efficient, we tried to to be as

10  efficient in our operations as we could, in every way.  I don't

11  know how else to say it other than that.  We just tried to be

12  smart about what we spent.  We tried to watch every penny and

13  make sure that we were doing right the best we could, just

14  making it work the best we could with what we had.

15  Q.    Did you do any additional job duties related to trying

16  to get additional income for Zona Rosa outside of the tenant

17  expenses or tenant income you would have?

18  A.    Sure.  I was always trying to drive what we call

19  ancillary income.  Any income for the center was good income,

20  just like the sponsorship income that we talked about earlier.

21  So, yeah, I was always trying to find ways to generate income

22  for the center.

23  Q.    In what ways would you try to generate income?

24  A.    Sponsorships are a big thing.  I would be in charge --

25  I wouldn't do national leasing, but I would lease with local

1  tenants, so trying to get local tenants in there.  And just any

2  sort of events, what we call revenue-generating events, so

3  events that we could have that would drive revenue for us, for

4  the developer.

5  Q.     And did you find that some of the sponsorships you were

6  able to obtain would be related to your relationships you had

7  built throughout the community?

8  A.     Absolutely.

9  Q.     How so?

10  A.     Well, like with North Kansas City Hospital, I came to

11  know the CEO of the hospital because she was on the board of

12  the chamber, so that's how I developed a partnership with her,

13  who then told me I needed to talk to their marketing people,

14  and et cetera, et cetera.  That's how we got -- that's how we

15  got the partnership going.

16          So I think most of the things, most of the events

17  and activities that I participated in throughout my tenure at

18  Zona Rosa can all be tied to relationships, and I think that's

19  a great way to manage, and I think that's a great way to build

20  a center.  And how we did build Zona Rosa was through these

21  relationships and getting to know people, and because you want

22  to do business with people you know and you want to work with

23  people you know.  And that's -- that's what we did.

24  Q.     I'd like to talk to you now about the MAXI Awards and

25  how those work.  What is a MAXI Award?

1  A.      A MAXI Award is given by the International Council of

2  Shopping Centers, and it's an international award for marketing

3  excellence in shopping centers.

4  Q.      How does that process work?  How does someone apply for

5  or receive a MAXI?

6  A.      So there is an application process, and it's changed

7  over the years.  And you submit an entry.  There's a process

8  involved with doing that.  You have to write a narrative, you

9  have to submit samples of your work.  So depending on what the

10 program is, you submit samples of photographs or whatever the

11 activity was, or -- you know, anything related to that program,

12 you submit it to ICSC, and they have a panel of judges who

13 judge the entries.

14 Q.      So simply because you enter, you don't become a

15 finalist?

16 A.      No.

17 Q.      And then how does it work after you become a finalist?

18 A.      So a couple of months before the awards ceremony, the

19 ICSC comes out with the finalist list so you know if you've

20 made it to finalist status.  And then they have the awards

21 ceremony, and that's moved around to different places

22 throughout the years.  It now the last few years has landed at

23 the Las Vegas ICSC leasing convention, which is their annual

24 event where all of the developers and retailers go to do

25 leasing, and the MAXI Awards became part of that leasing

1  convention a few years back.  I don't remember when.

2  Q.    How did you become familiar with MAXI?

3  A.    I got familiar with MAXI when I started at Independence

4  Center because -- because back in those days, ICSC would

5  publish this really nice hardback book of all of the MAXI

6  winners.  And the company that I worked for at the time would

7  purchase those books every year and would share them with us on

8  staff.  And I remember flipping through those books and reading

9  about these great programs that different shopping centers --

10  and at this time, it was across -- it was worldwide.  It wasn't

11  just United States, it was across many countries.  And

12  different shopping centers would do these programs, and I

13  remember thinking as I was a 25, 24-year-old marketing person

14  at these centers, I was like, that would be cool to do that

15  someday, to be published in this book as being kind of the best

16  of the best for shopping center marketing.

17        So I heard about it from my very first job.

18  Q.    And during your tenure at Zona Rosa as the general

19  manager, would Zona Rosa enter into -- have an application

20  entered into to be considered for a MAXI Award?

21  A.    Yes, several times.

22  Q.    And so I'd like to talk to you about some of those

23  processes.  Would you enter -- and what role did you play in

24  that application process?

25  A.    So I always wrote the award, or wrote the entry for the

1  award, typically; and then usually my team, Brenda,

2  administrative assistant, Audrey, marketing assistant, they

3  would help, as well.  But I typically always did the narrative,

4  and they would work on supplemental things and pulling together

5  all of the information we needed to enter the award.

6  Q.    And so these were programs that you were already

7  having, correct?

8  A.    Correct.

9  Q.    You weren't having programs to be able to get a MAXI.

10  A.    Oh, no.

11  Q.    And so after the MAXI finalist list, how did someone

12  understand if they won a MAXI?

13  A.    Well, you would have to attend the event.

14  Q.    And during your tenure at Zona Rosa as the general

15  manager, did you attend the MAXI Awards?

16  A.    I did.

17  Q.    And how often would you attend?

18  A.    I attended every time we were up for an award.

19  Q.    And was it something where you would always put Zona

20  Rosa up for a MAXI Award?

21  A.    No, no, no.  There were many years we didn't enter.  We

22  entered when we thought we had an innovative program.  We did a

23  lot of innovative things and things that we thought were worthy

24  of recognition and national recognition, not just for Zona

25  Rosa, but for Olshan Properties.  So we entered different

1  awards over the years when we felt that there was a program

2  that was deserving of it.

3   Q.     So we're not going to go through each of the MAXIs that

4  you were involved with and that Zona Rosa received recognition

5  for during your tenure as general manager, but I would like to

6  talk to you about a couple of them.

7         What is the difference between a MAXI Merit and a

8  MAXI Silver and a MAXI Gold?

9   A.     So at the beginning, ICSC awarded what they call a MAXI

10 and a MAXI Merit.  And a MAXI Merit was kind of the runner-up

11 award, so they would give some of those out, as well.  But the

12 MAXI was the main award, and then you could win the Merit,

13 which was the runner-up award.

14        Over the years, it changed and became the MAXI Gold

15 and the MAXI Silver.  Still the same idea.  The gold was the

16 winner, and the silver was kind of the runner-up.  So they

17 would give various gold and silvers in different categories.

18  Q.     And so during the end of -- well, let's step back a

19 little bit.

20        Was the Change for Charity program ever submitted as

21 a program to be considered for the MAXIs?

22  A.     It was.

23  Q.     And I'm back on Exhibit 4 now.  If you'll look at

24 Exhibit 4 under MAXI, it indicates Change for the Better?  Was

25 that the entry?

1  A.      It was, yes.

2  Q.      And it did receive that award back in 2014.

3  A.      It did, the silver award.

4  Q.      Now, during the end of your tenure at Zona Rosa, it

5  looks like in 2017, I'd like to talk to you about the MAXI

6  Award process and how it worked that specific year.

7          Did you make an entry on behalf of Zona Rosa in

8  2017?

9  A.      Yes.

10 Q.      And when you would -- when Zona Rosa would make an

11 entry, who would be -- if you won, who would receive the award?

12 A.      Well, it's awarded -- it's kind of twofold.  It goes --

13 I mean, if you look at the award, it says Zona Rosa on it, but

14 then you put into the award submission what they call

15 professional recognition due.  So you would get five people

16 that you could list on each award that would be getting the

17 professional recognition, essentially awarded the MAXI, should

18 the MAXI be awarded.

19 Q.      And when you would complete the application for Zona

20 Rosa, who would you include for the professional recognition?

21 A.      I would include whoever at our center was instrumental

22 in developing that award.

23 Q.      The staff?

24 A.      Correct.  And then I would always -- because I said

25 there was five, you could enter five names, and so I always --

1  I always thought of it as three names being center names,

2  myself and my team members who had been instrumental in that

3  program, and then I would always include my direct supervisor's

4  name, and then I would always include the owner of the company.

5  Q.     And in 2017, the program was 12 Days of Facebook Live

6  that was entered?

7  A.     Yes.

8  Q.     What was that program?

9  A.     That was a program that we developed because we had a

10  really tight budget for Christmas that year, and we were trying

11  to come up with ways to promote the center and promote our

12  tenants.  And this was also around the time which Facebook Live

13  was just kind of becoming a thing.  So we decided to go on

14  Facebook Live.  I kind of became my own -- the Zona Rosa

15  influencer, per se.  We -- I became the expert on all things

16  Christmas that you could buy at Zona Rosa.

17          So I would -- I featured 12 days of various topics,

18  and I would do one day of gifts for your kids or gifts for your

19  spouse, and we did -- or we would do themes, and we would

20  promote our stores and restaurants that had that type of

21  gifting and give them recognition, show their products.  We

22  would tape it in my office -- I shouldn't say tape.  We filmed

23  it in my office.  And I would promote our stores -- mainly

24  stores, but we threw in a few restaurants along the way -- and

25  talked about what gifts we had at Zona Rosa that people could

1  get.

2  Q.     And once this program was submitted to the MAXIs, did

3  it become a finalist?

4  A.     It did.

5  Q.     What were the next steps for you after Zona Rosa's

6  program of the 12 Days of Facebook Live became a finalist at

7  the MAXIs?

8  A.     Well, we wanted to go to Vegas to see if we won our

9  award.

10 Q.     And you had indicated that you had been in the past --

11 you had been individually in the past.  Had you ever gone to

12 this awards ceremony with other employees at the center before?

13 A.     I had.

14 Q.     And how often had that been the case?

15 A.     It happened many times.

16 Q.     And so in 2017, was that any different?

17 A.     It was not.

18 Q.     Who went to the MAXI Awards with you in 2017?

19 A.     It was Audrey Sisco, the marketing assistant whose name

20 was on the award; Brenda Noorbakhsh, our administrative

21 assistant whose name was on the award; Madelyn Bowden, who is a

22 guest services employee; Linda Nichols, who was a guest

23 services employee; and also Audrey's mother, who worked at the

24 center; and Todd Sharbono.

25 Q.     You just listed several people.  Did you have any

1 reason to believe that there would be coverage issues at Zona

2 Rosa, given those employees that were going with you to the

3 event?

4 A.      No.

5 Q.      Why not?

6 A.      Because the center was covered.  The center was always

7 covered.  We had plenty of people at the center, and I would

8 typically ask if anybody wanted to go because it was exciting.

9 It was really great for the center to get this recognition, and

10 throughout the years, different employees would go, and on

11 their own dime.  But first and foremost, I would always make

12 sure that the center had coverage.  I would never leave Zona

13 Rosa unattended.

14 Q.      And so let's talk about generally the coverage and how

15 you understood the process to be.

16          What was your understanding about your availability

17 to Zona Rosa?

18 A.      Yeah.  So I would always -- and I had for 14 years

19 always looked at myself, the facilities manager, director of

20 operations, that role, and also the director of security as

21 kind of -- I always said they were the triangle.  You know, one

22 of the three of us always had to be either at the center or

23 nearby, at least able to respond.

24          So we would, between the three of us, coordinate.

25 We would have director meetings every week, just the three of

1  us, where we would coordinate our schedules to make sure if I

2  was going to for some reason be out of town, one of the others

3  would be around and available. So somebody had to be available

4  to be at Zona Rosa if they weren't already there within a few

5  minutes if there was some sort of an emergency.

6  Q.     And with the individuals that were going to that MAXI

7  Award in 2017 that you had listed, was the company paying for

8  any of them to attend?

9  A.     No.

10  Q.     And did they attend at their own expense?

11  A.     Yes, we all did.

12  Q.     And was Olshan Properties aware of the fact that there

13  were multiple employees from Zona Rosa attending this event?

14  A.     Yes.

15  Q.     And how did you let them know that information?

16  A.     How did I let --

17  Q.     Your direct supervisor know the information of who

18  would be attending?

19  A.     I told him.

20  Q.     And was there any reason to believe that you didn't

21  have permission to attend this event?

22  A.     No.

23  Q.     You went to Las Vegas in 2017 for the MAXI Awards.

24  What happened there?

25  A.     We won gold.

1  Q.     And was there any additional awards that you won that

2  night?

3  A.     Yes, we won the gold award, and we were all excited

4  and, you know, kind of sitting back at the table excited that

5  we had won.  And I quite frankly -- my husband couldn't go that

6  year because he's a school teacher and he was still in class,

7  so he couldn't go.  And I was busy texting him that we had won;

8  and I wasn't even paying attention, and everybody started

9  screaming again, and they said we won another award.  I wasn't

10  even paying attention.

11         So we were all ushered back up to the stage, and we

12  found out that the ICSC had given us a special award, it was

13  the first time they had ever awarded it, and it was called a

14  Judges' Distinction Award.  And they said they had awarded it

15  to us because we had the highest-rated entry, and we spent the

16  least amount of money.  So we were thrilled and overwhelmed and

17  shocked because they had never even given that type of award

18  before.

19  Q.     What happened -- was this a high point of your career?

20  A.     Yeah, it was pretty great.

21  Q.     What happened when you came back to Kansas City after

22  winning that award?

23  A.     I was written up.

24  Q.     I'd like you to look at Exhibit 10, please.  Exhibit 10

25  is that write-up, correct?

1  A.      Uh-huh, yes.

2  Q.      Dated May 22, 2017?

3  A.      Yes.

4          MS. DICKSON:  I would move for Exhibit 10 to be

5  admitted into evidence.

6          THE COURT:  Any objection?

7          MR. LILLARD:  None.

8          THE COURT:  Exhibit 10 will be admitted.

9          (Plaintiff's Exhibit 10 was admitted into evidence.)

10  BY MS. DICKSON:

11  Q.      Now, what was your understanding as to why you were

12  receiving this?

13  A.      Steve had -- actually I saw this, it came through on my

14  e-mail at like 7 a.m.  It was early that morning, I wasn't even

15  at work yet.  And I remember I would always monitor my e-mails,

16  and I saw it come through.  And he said, call me when you get

17  in.  And I looked at it, and I was shocked because it said that

18  I had neglected to get approval and that I had left the

19  property in the hands of a, quote, fairly new director of

20  security.  So I was just -- I was flabbergasted, quite

21  honestly.

22  Q.      Had you ever received any kind of discipline during

23  your tenure as a general manager at either Steiner & Associates

24  or Olshan?

25  A.      I had not.

1   Q.     Did Mr. Barnhouse know that the facilities manager was

2  going to Las Vegas to attend the MAXI Awards?

3   A.     He did.

4   Q.     And were you ever told that if both you and the

5  facility manager went that there would be some kind of

6  discipline associated with this?

7   A.     I did not -- I was not told that.

8   Q.     If you look at Exhibit No. 10, this was in the -- it

9  was your understanding that the type of discipline, that this

10  would be was a first infraction, correct?

11   A.     Correct.

12   Q.     What did you understand to be a fairly new third-party

13  security director?

14   A.     Well, that was the problem.  I didn't quite understand

15  what that meant.

16   Q.     How new was the security director?

17   A.     He had been there for a few months.

18   Q.     And did you have any concerns with him being there

19  during the time that you were in Vegas?

20   A.     No.  Dan Osborne was the director of security.  He --

21  former military background.  He had come from the Country Club

22  Plaza, he had been an assistant there, and the same third-party

23  company that we had at Zona Rosa was also at the Plaza.  And so

24  they spoke very highly of him and wanted to promote him to a

25  director's position.  So he came and interviewed with me, and I

1  liked him a lot, and he started as our director of security.

2  Q.    I'd like you now to look at Exhibit No. 11.

3  A.    Okay.

4  Q.    You disagreed with the discipline that you had received

5  from Mr. Barnhouse, correct?

6  A.    Correct.

7  Q.    And Exhibit No. 11 is the memo that you wrote

8  associated with that team member counseling, correct?

9  A.    Correct.

10          MS. DICKSON:  I would move for Exhibit No. 11 to be

11  admitted into evidence.

12          THE COURT:  Any objection?

13          MR. LILLARD:  No objection, Your Honor.

14          THE COURT:  Exhibit 11 will be admitted.

15          (Plaintiff's Exhibit 11 was admitted into evidence.)

16  BY MS. DICKSON:

17  Q.    Why did you dispute this counseling that you received

18  from Mr. Barnhouse?

19  A.    I was just shocked because we had gone to Las Vegas

20  before, various staff members for the event.  The center was

21  staffed.  Dan Osborne, the director of security, was there, and

22  I was available the whole time.  And I think I even listed in

23  here what I had done during that time I was in Las Vegas.  I

24  took 35 phone calls, I responded to e-mails, text messages, and

25  I was even on a conference call while we were in Las Vegas.

1  And Todd was the same way.  So I just couldn't understand what

2  was different this time when we had gone other times and there

3  had not been an issue.

4  Q.     And -- go ahead.

5  A.     Well, I was just going to say I was very upset that I

6  was written up.  I had never -- in my entire professional

7  career had never had a write-up, and I took this job, as I take

8  every job, before and since, very seriously.  And I didn't look

9  at it lightly at all, and I was very concerned that I was

10 getting this discipline.

11 Q.     And there was a question about policies and procedures

12 that were violated.  What did you ask Mr. Barnhouse and your

13 employer to clarify related to this counseling?

14 A.     Property coverage levels, because that was the whole

15 crux of the matter from what I understood.  And I asked him

16 where there was something that showed what the expectation was

17 on property coverage levels.  And I explained to him, as I just

18 said, about this kind of triangle that I had always operated

19 with the prior 13 years and it had never been an issue.

20          So I had asked him, if there is a concern, I need to

21 understand it because it's going to shift how I do things.  And

22 I didn't understand what he was expecting.

23 Q.     And did he respond to you related to that?

24 A.     He didn't.

25 Q.     And so what was your understanding moving forward after

1  receiving this?

2   A.      He just -- you know, I did ask him about it when I

3  didn't get a response, and I said, you know, what are we doing

4  about this?  And he kind of just -- I took it, he just brushed

5  it under the rug.  He said, look, don't worry about it, it's

6  not a big deal.  I had to do it, but you're more worried about

7  it than I am.  And I said okay, so I'm just going to keep doing

8  what I'm doing, I guess.

9          There was no response, but that was typical with

10 Steve.  It was just, don't worry about it.  So I didn't worry

11 about it.

12  Q.      And from that time moving forward, if you and your

13 facilities manager were going to both be unavailable, did you

14 let your supervisor know that?

15  A.      Yes.

16  Q.      And what did you consider unavailable?

17  A.      If I took a vacation day or if he took a vacation day

18 or if Dan took a vacation day or if we were sick or whatever.

19 Just somebody -- but again, somebody had to be able to respond

20 to the center.

21  Q.      And even while you were on vacation, did you ever feel

22 like you were unable to respond to the center's issues?

23  A.      No, it was a 24/7 job always.

24  Q.      How was the rest of your year after receiving that

25 counseling?  Did you and Mr. Barnhouse ever have any other

conversations about coverage issues up until February 5th?

A.      We did have a conversation prior to Christmas.

Q.      And what was that conversation?

A.      Olshan had kind of a use-it-or-lose-it vacation policy. So -- and as typical with retail, I had actually a self-imposed blackout period for my team from, like, Thanksgiving to Christmas.  I didn't want people taking vacation because that was a busy time for the center.  So sometimes it would happen that people would accumulate time, and, instead of losing the time, you would want to take it.

So I think pretty much my entire tenure of my shopping center career, I would take the week off between Christmas and New Year's, that was just kind of my breather from having handled a busy holiday season.  And Todd came to me and expressed that he had time left, as well.

So because of the situation that had happened earlier in the year, I called Steve, and I said, hey, I'm going to take off -- and Steve approved my time.  So I said, I'm going to take off between Christmas and New Year's, and Todd has time too.  Are you okay with that?  Because I don't want to have any sort of issues, as we did in May.

And he said, that's not a problem at all, even let your team know if they need to call me, they can call me.  And I told him I wasn't even leaving town, and I live ten -- less than ten minutes from Zona Rosa.  So I told him even though I

1    was officially on vacation, I would be available, as I always

2    was.  And it was left at that.

3    Q.    You had mentioned a use-it-or-lose-it vacation policy.

4    I would direct your attention to Exhibit No. 1, and

5    specifically page 13 of that exhibit.

6    A.    Uh-huh.

7    Q.    This is the employee handbook, or the policies that

8    Olshan, as your employer, had during your tenure, correct?

9    A.    Correct.

10          MS. DICKSON:  I would move for Exhibit No. 1 to be

11   admitted into evidence.

12          THE COURT:  Any objections?

13          MR. LILLARD:  No objection.

14          THE COURT:  Exhibit 1 will be admitted.

15       (Plaintiff's Exhibit 1 was admitted into evidence.)

16   BY MS. DICKSON:

17   Q.    On page 13, this discusses the Olshan Properties policy

18   on use-it-or-lose-it.  And you had mentioned that it was a busy

19   time of year towards the end of the year.  What was your

20   understanding of when vacation had to be used?

21   A.    By the end of the year.  I don't think I'm on the same

22   page.

23   Q.    Page 13?  And what would happen if you didn't use that

24   time?

25   A.    That you would forfeit the time.

1  Q.      And were you encouraged to take the time off that you
2  received?

3  A.      Yes.

4  Q.      And had there ever been an issue with you taking that
5  time off towards the end of the year during your tenure as the
6  general manager at Zona Rosa?

7  A.      No, I always took it.  And I typically always forfeited
8  time too because I just never used all of my vacation.

9  Q.      And were there times where -- prior to this holiday
10  season in 2017 where you and your facilities manager would
11  take -- would overlap in your time-off request?

12  A.      Yeah, potentially always.  I mean, there were times
13  that that would happen, as it would with the director of
14  security, too.

15  Q.      And so based on the information -- based on the
16  information that you received from your supervisor, Mr.
17  Barnhouse, during the conversation where you let him know that
18  you and Todd would be taking PTO time at the same time, did you
19  understand that there would be an issue with that in the
20  future?

21  A.      No.

22  Q.      We've talked about some of the programs that Zona Rosa
23  hosted or had during your tenure as general manager, and I
24  believe you said there were many events that you would have in
25  any given year, correct?

1    A.      Correct.

2    Q.      Any idea about in any given month how many programs

3    that you would have?

4    A.      Well, that changed seasonally, too.  I think one year

5    we did add it up, and if you counted all the concerts, because

6    we would do concerts three nights a week, and all the other

7    activities, I think one year we did 150 or 175 events

8    throughout the year.  So it was a very active place.

9    Q.      And so I want to talk to you about one of the events

10   that you had in any given year, and I believe that you had it

11   twice in 2017, Vintage Market Days.

12   A.      Yes.

13   Q.      What is Vintage Market Days?

14   A.      Vintage Market Days is a vendor-driven event where

15   vendors from -- not just local vendors, but national vendors

16   come together and sell repurposed, upcycled goods that they

17   create and make.

18   Q.      How did you learn about this?

19   A.      I learned about it on social media.

20   Q.      And what was your interest with Vintage Market related

21   to Zona Rosa?

22   A.      Zona Rosa from almost the beginning had had an arts

23   festival similar to the Plaza Arts Festival, but on a much

24   smaller scale.  And we had started that, I think, the year we

25   opened the center.

1        I had been approached by the county commissioners,

2   they had just formed a new arts council for Platte County, and

3   they asked me to come be a part of that and discuss ways they

4   could promote the arts in Platte County.  And at that first

5   meeting, it came up that we should try to do an arts fair, an

6   arts festival, and I volunteered Zona Rosa as a location for it

7   because I thought it would be a great opportunity for the

8   center -- again, a new center that's just opened -- and to try

9   to develop an arts festival.

10       But over the years, that festival kind of waned a

11  little bit.  And we would try to do it the weekend before the

12  Plaza.  We sandwiched ourselves -- there was the Westport Art

13  Fair, and then we would do Zona Rosa, and then the Plaza would

14  have their arts fair, and the Plaza has a world-renowned arts

15  fair.

16       So we always felt like it waned a little bit, and we

17  never quite got it to the level that it needed to be.  It was

18  just kind of a constant challenge and struggle, and it just

19  never got -- it never took off the way we wanted it to, even

20  though it was around for quite a few years.

21       So at that time, I was trying to look for an event,

22  we were trying to look for an event that would potentially

23  replace that arts festival, some sort of an event we could do

24  that time of year that would be income-generating -- because we

25  did make money from the arts festival, not a lot.  But

1   something that could replace the arts festival, and that was

2   kind of what we were looking for.  And I heard about this thing

3   called Vintage Market Days.

4   Q.      And had you had any prior involvement or participation

5   with Vintage Market Days prior to it coming to Zona Rosa in the

6   spring of 2017?

7   A.      No.

8   Q.      So what steps did you take to look at hosting Vintage

9   Market Days at Zona Rosa in the spring of 2017?

10  A.      So their first event was sometime in '16, and I went to

11  the event.  And it was out at the old Metcalf South Mall when

12  it was still around, the old Macy's store there.

13          And I remember I drove up, and there was so many

14  people just in line trying to get into this event.  And I was

15  overwhelmed because I thought, look at all of these people that

16  are here.

17          And so I went in and looked at the event, looked

18  around, and kind of got a sense on what it was.  And then I

19  tried to pursue the franchise owner at the time to have the

20  event at Zona Rosa.  I called him and asked him to bring the

21  event to Zona Rosa.

22  Q.      And they did that?

23  A.      Not right away.  I think I stalked him at two or three

24  more events that I went to and said, hey, you need to come, I

25  think we could do this at Zona, I think it would be a great --

1  they hadn't done anything on the north side of town, he had

2  done some things out south.  And the odd part of the story is

3  he was actually -- he had formerly been the district manager of

4  our Marshalls store at Zona Rosa.  I didn't know that at the

5  time, his wife actually owned the franchise, but I found out

6  that her husband -- I had a prior relationship with him.

7        So I knew Ken, and I would call him and say, hey,

8  when are you going to be ready to move this to Zona Rosa?  And

9  he finally -- they finally agreed to do it.

10  Q.    When was the first Vintage Market at Zona Rosa?

11  A.    It would have been in April of '17.

12  Q.    And how did it go?

13  A.    It went really well.

14  Q.    What did it look like to hold a Vintage Market Days?

15  A.    Well, part of the challenges that they had with us was

16  where would it be held because they charge to get into their

17  event, and most events at Zona Rosa were free, they weren't

18  charged events.  So we tried to figure out what would be the

19  best -- where would be the best place to hold it.  And I

20  actually suggested holding it in one of our parking garages

21  because we could easily control access, traffic flow in and

22  out, and then we could also be somewhat protected from the

23  elements.  Because, as you know, it's hard to do events in

24  Kansas City any time of year because you don't know what the

25  weather is going to be.

1          So I was able to kind of get him -- get them, Kate

2   and Ken, the owners, to kind of embrace the idea of doing it in

3   a very nontraditional place, which was a parking garage.

4   Q.     And was Olshan Properties aware of the Vintage Market?

5   A.     Yes.

6   Q.     And did you have conversations with Mr. Barnhouse about

7   this program?

8   A.     Oh, yes, because it was a lease.  Essentially, they

9   leased space, so that had to be all approved.

10  Q.     Other than the leasing of space, was there another

11  reason why it would be beneficial for Zona Rosa to hold the

12  Vintage Market Days?

13  A.     What I loved about it was it was an income-generating

14  event.  They were going to pay us $10,000 for use of the center

15  for essentially a week, this garage.  And what I loved about it

16  even more is that this arts festival that it was replacing was

17  super labor intensive for our team, there was just a lot to be

18  done to set up an arts festival.  But this event was very

19  turnkey.  They were going to set it all up, they were going to

20  manage it, it was their event.  They were essentially just

21  leasing the space to hold this event that was going to draw

22  people to our center.

23  Q.     I'd like to talk to you now about -- you'd indicated

24  that there was a spring event of the Vintage Market.  Was it

25  the understanding that there would be both a spring event and a

1  fall event?

2  A.      No, we just signed a lease for one event.

3  Q.      How did it come to be the case that there was a second

4  event that year with Vintage Market Days?

5  A.      Because they had a fantastic event.  We thought it was

6  great.  Our tenants loved it because, especially our restaurant

7  tenants, because they felt like so many people came to the

8  event and then stayed and had lunch, or they went to dinner.

9  And it just -- it drew, I don't know, 15,000-plus people.  So

10  it just really activated the center, particularly at a time of

11  year that's not -- sometimes not super busy.  And everybody

12  just loved it.  They thought it was a very unique, fun,

13  different event, and the owners of the franchise loved the

14  location.  They did very well, they said, so they were anxious

15  to have another one.

16  Q.      And now, I want to step back with you a little bit into

17  a program and a charity that you had worked with and been a

18  part of it.  Hillcrest Transitional?

19  A.      Yes.

20  Q.      Are you -- what was your role in working with

21  Hillcrest?

22  A.      I had been a board member of Hillcrest Transitional

23  Housing for several years, and also I was a board chair.

24  Q.      And so did you -- did Hillcrest have an annual event

25  that you would participate in as the face of Zona Rosa?

1    A.      Yes, Zona Rosa would sponsor Hillcrest's annual gala.

2    We would also hold a walk for the homeless at Zona Rosa

3    annually too.

4    Q.      I want to talk to you about the 2016 gala that

5    Hillcrest held.  Did they ask Zona Rosa to put together

6    anything for this event?

7    A.      They did.  They asked us to -- Hillcrest also had a

8    thrift shop, they have several of them throughout the city.

9    But they were wanting to do something different for the gala.

10   So they approached several businesses, including Zona Rosa,

11   about participating in what they called a thrift-flip

12   challenge.

13   Q.      What was a thrift-flip challenge?

14   A.      They wanted us to get something from the thrift store

15   and turn it into something else.  And they didn't really put

16   any parameters on it.  They said, come pick out something and

17   turn it into something that we will then put in the gala to be

18   auctioned off.

19   Q.      And did this appeal to you?

20   A.      It did.

21   Q.      Why?

22   A.      Because I'm just creative and I like to do things, and

23   I had already started -- I had taken some classes prior on

24   restoring furniture and painting furniture.  My mom passed

25   away, and I had inherited a lot of her stuff that wasn't my

1  taste, particularly, but I didn't want to let it go, so I took

2  a class to learn how to, as I say, funk-up the furniture and

3  make it a little more interesting to me.

4          So I had done that, and I thought this could be fun

5  because we could do it on behalf of Zona Rosa.

6  Q.     And so did you do this on your own, create this --

7  A.     Thrift flip.

8  Q.     -- thrift flip?

9  A.     Well, Todd helped because he's -- I call him MacGyver

10 because he can do anything and make anything.  So he helped

11 develop the piece that we put together.

12 Q.     And the piece that you made, you donated that on behalf

13 of Zona Rosa?

14 A.     Yes.

15 Q.     And what was the feedback that you received related to

16 that?

17 A.     People loved it.  It was -- I don't even recall how we

18 came up with it, but it was, we took three different chairs and

19 turned it into a bench.  And we called it a funky bench, and

20 people loved it.  They thought it was really cool, and it was

21 featured in the auction.

22 Q.     I would ask you to look at Exhibit No. 72, please.

23 Could you please identify Exhibit No. 72?

24 A.     That's our funky bench that we made for the Hillcrest

25 auction.

1          MS. DICKSON:  I would move to admit Plaintiff's

2    Exhibit 72.

3          THE COURT:  Any objection?

4          MR. LILLARD:  One moment, Your Honor.  I'm a little

5    behind on the -- this is Exhibit No. Seventy --

6          MS. DICKSON:  72.

7          MR. LILLARD:  I have no objection to the funky

8    bench, Your Honor.

9          THE COURT:  Exhibit No. 72 will be admitted.

10          (Plaintiff's Exhibit 72 was admitted into evidence.)

11   BY MS. DICKSON:

12   Q.    This was the funky bench?

13   A.    That's it.

14   Q.    And what did doing this project with Todd do for the

15   two of you moving forward?

16   A.    Well, it was kind of the genesis of us building more

17   benches and starting our hobby and what eventually turned into

18   our business, RT Rustics.

19   Q.    And it started with this bench?

20   A.    It did.  It started with the bench.

21   Q.    And where did it go after that?  What did you do after

22   this bench was donated?

23   A.    When people would see it, they were like, you should do

24   more of those.  And people thought it was cool, and we thought

25   well, maybe we should do more of them.  People were asking us

1   about them.  So we started making benches, that's how it all

2   started.

3   Q.      When would you do this?

4   A.      We did it on our own time, evenings, weekends.

5            THE COURT:  I think this is probably a good time to

6   break for the evening.

7            So, ladies and gentlemen, tonight when you get your

8   cell phones, when you get home, when you're talking with your

9   spouse, your neighbor, your dog, whatever, it's going to be the

10  next temptation you have to talk about this case, to google

11  Zona Rosa, to do some research on this case, and I really very

12  strongly urge you to resist that temptation.  Our system of

13  justice is really based on the idea that all of the evidence

14  that you get to make a decision has to come from this witness

15  stand and from these exhibits that have been introduced here,

16  and it has to come from information that you get within the

17  courtroom.

18           And so it's extremely important to both of these

19  parties who have spent a lot of time and energy in pulling

20  information together and presenting this case to you that you

21  don't make a decision based on anything other than what is in

22  this courtroom, that you don't do any googling, researching,

23  driving by any places, anything of that sort.

24           So tonight -- you're going to hear this a lot this

25  week -- don't discuss this case with anyone, do not permit the

1  case to be discussed in your presence, do not do any research.

2  Just put the case out of your mind tonight. You've had a long

3  day, you've had a lot of information thrown at you in a short

4  period of time. So relax, enjoy the evening, come back

5  tomorrow refreshed and with an open mind.

6          And so we will be in recess until tomorrow at 9 a.m.

7          (The following proceedings were had in the courtroom

8  out of the presence of the jury:)

9          THE COURT: There are a couple issues that I would

10 like to bring up, the first of which is the IT department needs

11 to know when the video witnesses are testifying. And I'm not

12 really even sure if both sides are presenting video testimony

13 or only one. Can the parties who are presenting testimony let

14 me know when you plan on calling the witnesses?

15         MS. DICKSON: Your Honor, we plan to -- I would

16 think that it would be at the very end of tomorrow would be

17 best-case scenario to present the remote witnesses. I think

18 that it's much more likely that it would be Wednesday morning.

19         THE COURT: Okay. Mr. Lillard, are you presenting

20 any video testimony?

21         MR. LILLARD: Yes, we're presenting the testimony of

22 CEO Andrea Olshan, Wayne Chang in Columbus, Ohio, and Miss

23 Selwa, also from New York City.

24         THE COURT: So the only witness that you have is a

25 custodian witness?

1          MS. DICKSON:  No, they are his witnesses, but we

2     will be calling them -- I'm sorry, I apologize -- Mr. Chang and

3     Ms. Olshan in our case, so that's why I indicated Wednesday.

4          THE COURT:  Okay.  And then is there also a

5     custodian that's being called?

6          MS. DICKSON:  I don't know that there will need to

7     be.  We're trying to work out a solution so that that wouldn't

8     be necessary.

9          THE COURT:  Well, I will tell IT -- there's some

10    modifications that they need to make to the screens so that we

11    can run Zoom through the screens rather than the evidence.  And

12    so they need a bit of a heads-up so that they can make the

13    changes that they need.  I will put them on notice that maybe

14    tomorrow, but if -- tomorrow at lunch will you know for sure?

15         MS. DICKSON:  Yes, I will.  And if it's easier for

16    the Court, I'm happy to make it work first thing Wednesday

17    morning and try to reorganize witnesses.

18         THE COURT:  It would be easier for IT if it was

19    first thing Wednesday morning because then they can come in --

20    they come in every morning and check the software and -- check

21    the equipment, I should say.  And so if they could set it up

22    Wednesday morning, that would be easier.

23         MS. DICKSON:  We will make that work.  Thank you.

24         MR. LILLARD:  Your Honor, if I could on that, Andrea

25    Olshan is in New York City, and Wayne Chang is in Columbus.

1  Can you let us know which one you would call first so we can
2  alert them because the people on the other side need to be
3  aware of that, as well.

4  　　　　MS. DICKSON:  Yes.  We plan to call Mr. Chang first.

5  　　　　THE COURT:  And then on the issue of exhibits, I
6  think it would really save a lot of time and the jury would
7  appreciate it, as would I, if -- before a witness, if the
8  parties could discuss what evidence they're planning on
9  admitting through that particular witness to determine whether
10 or not the evidence can be stipulated to.  We're spending a
11 fair amount of time not really even laying a foundation because
12 it appears as though to the majority of these, you're not
13 objecting.  So if we could save some time in that respect, I
14 know the jury would appreciate that.

15 　　　　MR. LILLARD:  If I could, for clarification, we've
16 been told -- since these are the witnesses that we're going to
17 be calling remotely, we were told that they have to have the
18 exhibits on their side because you can't show that to them --

19 　　　　THE COURT:  That's correct.

20 　　　　MR. LILLARD:  So we've made arrangements for that to
21 happen.

22 　　　　THE COURT:  For the video witnesses, that certainly
23 is the case.  We don't have the technology to have the exhibits
24 shown while on the same screen as the Zoom presentation is
25 taking place.  But I think even -- for example, with the

 1  testimony today and with the live witnesses, if the parties
 2  before the witness could get together and discuss the evidence.
 3  To the extent that there is agreement as to what exhibits could
 4  be admitted, I think that would save significant time.  Maybe
 5  not significant, but every minute counts; and the faster we
 6  can -- the faster pace that we can create, I know the jury
 7  appreciates.

 8          MR. LILLARD:  Your Honor, we have done that so far.
 9  I think we've managed to clear a number of them.

10          THE COURT:  Okay.  Let me know if there are some
11  that are stipulated to, and then we can enter them in the
12  exhibit list.  And then if they're entered, then the parties
13  can show them and we wouldn't need to, then, have the breaks
14  that we're having at this point.  So if that can be done, let
15  me know.

16          The last issue is Exhibit 65.  I've had the
17  opportunity to review Exhibit 65.  The majority of 65 is
18  statements that the plaintiff made to the reporter.  There are,
19  I think, two statements that either customers of Zona Rosa made
20  or -- I think it was two customers of Zona Rosa made.  I would
21  be inclined to overrule the objection and admit the exhibit if
22  those, the statements that the customers made were redacted
23  because I think that the majority of the remainder of it is not
24  hearsay, it's statements of the plaintiff.

25          There are also a number of -- I can tell you printed

1  out the web page, and there are a number of ads and stuff with

2  the web page that I think need to be pulled.  They're not

3  relevant, and they arguably are hearsay.

4           So, Mr. Lillard, review the exhibit again with the

5  idea of redacting the statements by anyone other than Ms.

6  Salerno and pulling the ads and see if your objection still

7  stands, and we can take that up tomorrow.

8           MR. LILLARD:  The ads were concerning because they

9  have things from child abuse to quite a number of offensive

10  things that have nothing to do with us.

11           THE COURT:  I'm sorry.  I did not hear you.  If you

12  could pull that microphone closer.

13           MR. LILLARD:  Yeah.  The most important thing for us

14  is there are -- this is a nine-page document.  It's got two

15  pages, and then --

16           THE COURT:  Right.

17           MR. LILLARD:  -- the rest of the pages are

18  photographs of -- stories about everything from child abuse to

19  other misconduct.

20           THE COURT:  That's what I'm saying.  Pulling those

21  from the exhibit and redacting the statements of the shoppers,

22  and then let me know tomorrow if -- in view of those two

23  things, if that will remedy your concern with introducing that

24  exhibit.

25           MR. LILLARD:  Understood, Your Honor, thank you.

1          THE COURT:  Is there anything else that I can take

2    up at this time?  Any other issues that the parties foresee,

3    for example, coming up tomorrow?

4          MS. DICKSON:  Not for the plaintiff.

5          THE COURT:  Mr. Lillard?

6          MR. LILLARD:  Your Honor, just for part of -- for

7    clarification, we have Ms. Salerno's original deposition here.

8    Our intent was simply if we need to use it to use the Elmo

9    system.  Is that acceptable with the Court?

10         THE COURT:  Yes.

11         MR. LILLARD:  Thank you.

12         THE COURT:  I mean, assuming that the foundation is

13   laid necessary to cross-examine her or impeach her on her

14   deposition, then yes.

15         MR. LILLARD:  Thank you, Your Honor.

16         THE COURT:  Okay.  I would like the parties to be

17   here at 8:30 tomorrow in the event that there are any issues

18   that need to be addressed so that we can keep the case moving

19   for the jury.

20         But if there's nothing else, then have a good night,

21   and I will see everyone tomorrow.

22         (The trial adjourned for the evening.)

23                        - - -

24                        - - -

25

1     <u>CERTIFICATE</u>

2          I certify that the foregoing is a correct transcript

3   from the record of proceedings in the above-entitled matter.

4

5

6    November 4, 2020

7                              /s/_____
                               Kathleen M. Wirt, RDR, CRR
8                              U.S. Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25